**STATE ex rel. HOWARD ELECTRIC COOP-
ERATIVE, Fayette, Missouri, et al.,
Relators-Appellants,**

v.

**James E. RINEY et al., Respondents.**

**No. 56328.**

Supreme Court of Missouri,
Division No. 1.

Jan. 8, 1973.

Motion for Rehearing or for Transfer to Court
En Banc Denied Feb. 12, 1973.

George A. Spencer, Columbia, Gregory C. Stockard, Jefferson City, for relators-appellants.

John C. Danforth, Atty. Gen., Walter W. Nowotny, Jr., Asst. Atty. Gen., Thomas J. Downey, Jefferson City, for respondents.

WELBORN, Commissioner.

Action in prohibition to prohibit the State Tax Commission from assessing the distribution lines and other facilities of relators—rural electric cooperative companies. Circuit court quashed preliminary writ and entered judgment against relators. They appealed.

The case was submitted in the circuit court under an agreed statement of facts, as follows:

"STIPULATION AS TO AGREED FACTS

"Come now the parties in the above-entitled cause and stipulate that in addition to the facts admitted in the pleadings, they agree to the following facts:

"1. That the State Tax Commission is an agency of the State of Missouri, created and established by Section 138.190 R.S. Mo.1959, and James E. Riney, Don G. Williams and Carl E. Davis are the members thereof, who have power of original assessment only as set forth in Section 138.-420 Revised Statutes of Missouri, and related statutes.

"2. That Callaway Electric Cooperative, Fulton, Missouri, Howard Electric Cooperative, Fayette, Missouri, Ralls County Electric Cooperative, New London, Missouri, Intercounty Electric Cooperative Association, Licking, Missouri and Central Missouri Electric Cooperative, Inc., Sedalia, Missouri, being the five named Relators, and the thirty-five other electric cooperative corporations represented by them as a class, are non-profit, cooperative corporations organized under, or converted to, "The Rural Electric Cooperative Law," Chapter 394, R.S.Mo.1959.

"3. That the Relators were organized by rural people who did not have central station electric service available to them, for the purpose of constructing facilities to bring electricity to themselves and to other rural people who also did not have central station electric service available.

"4. That the objects or purposes in which Relators are authorized to engage are set forth in Section 394.080 R.S.Mo. 1959. Of these objects and purposes au-

thorized, the Relators are doing the following:

"(a) Constructing electric distribution facilities.

"(b) Purchasing electric energy and selling it, in rural areas, over the electric distribution facilities it constructed, to its members, to Governmental agencies and political subdivisions and to others not in excess of 10% of the number of its members.

"(c) Making loans to persons to whom electric energy is or will be supplied by the Relators for the purpose of, and otherwise to assist such person in, wiring their premises and installing therein electric and plumbing fixtures, appliances, apparatus and equipment of any and all kinds and character, and in connection therewith, to purchase, acquire, lease, sell, distribute, install, and repair such electric and plumbing fixtures, appliances, apparatus and equipment.

"5. That the legislature did not require any state regulation on taxes or otherwise in the original act authorizing the formation of these cooperatives except safety matters dealing with construction, maintenance and operation of distribution lines in public places, but the legislature specifically prohibited public regulation over the service, rates, financing, accounting or management of the cooperative.

"6. That the legislature made the law governing the taxation of railroads applicable to electric power and light companies in 1923 and these cooperatives were not in existence at that time.

"7. That the Relators are presently operating as rural electric cooperatives in the State of Missouri with authority to sue and be sued.

"8. That Relators and the members of their class, most of which were organized during the years 1936, 1937 and 1938, were thereafter issued Certificates of Conversion authorizing them to convert into cooperative, non-profit, membership corporations, pursuant to the Rural Electric Cooperative Law, Chapter 394, R.S.Mo.1949, most of which were converted during the years 1945 and 1946. Copies of the Articles of Conversion and Certificate of Conversion of Relator Callaway Electric Cooperative, which are representative of all such instruments, were attached to the petition and made a part thereof.

"9. Although these distribution cooperatives have always been assessed by the local county assessors rather than the State Tax Commission, the legislature made no change regarding the manner of assessment in the law of 1945 or when enacting other amendments or revenue laws.

"10. That since the organization of the first of these cooperatives in about 1936 until the present time, the property of these cooperatives have been assessed by the local county assessor and all officials charged with administering the revenue laws of the state and county have followed this procedure.

"11. That Relators have adopted by-laws and membership certificates, copies of those of Relator Callaway Electric Cooperative, which are representative of all such instruments, are attached to said petition and made a part thereof.

"12. That Relators are prohibited from selling electricity to any one except their members and governmental agencies and to nonmembers not to exceed 10% of its members, but the number of non-members is far less than the 10% authorized by law, and does not serve or hold itself out as willing to serve any except the above mentioned consumers.

"13. That the statutory qualifications for membership in Relators require that members agree to use electric energy furnished by the cooperatives when such electric energy shall be available through their

facilities. In compliance with the statute, Relators' by-laws provide additional qualifications for membership, which includes provisions for termination of membership, and reserves the right to select its members.

"14. That each cooperative corporation is owned by its members and membership in said cooperative corporation is evidenced by a certificate. None of Relators have any capital stock of any kind. Each member has one, and only one, membership regardless of how many service connections he may have or how much electricity he may use. Therefore, subject to the provision that 10% of the users of the electricity sold by Relators may be non-members, Relators are owned and operated by those whom they serve.

"15. That the board of directors of Relators are elected by and from the members at their respective annual meeting, each member having one vote. Voting by proxy or by mail is permitted by the statute, but no person may vote as proxy for more than two members at any meeting.

"16. That the directors are chosen from different sections of the particular cooperative's service area. These boards, each having nine directors, manage all of the business and affairs of Relator-cooperatives, including all matters affecting capital structure, extension of lines and setting of rates to be charged for the electricity.

"17. That the Relators may not sell, lease, mortgage or otherwise dispose of all or any substantial portion of their property without an affirmative vote of not less than two-thirds of all of the members, after notice shall have been given of the proposed disposition in the notice of the meeting.

"18. There is no stock or other evidence of any interest in any of said cooperative owned by the general public and no one outside of the local respective members can have an ownership interest in any of said distribution cooperatives. Relators are not regulated by the Public Service Commission or by the state or federal securities laws.

"19. That the legislature by statute requires that the greatest proportion of its consumers shall be members. There is practically a complete identity and unity of interest between owner and consumer.

"20. That the electric energy consumed by the members of Relators is provided at cost. The cooperatives are not engaged in business for profit for themselves or their members, and any surplus receipts are allocated or returned ratably according to the amount of each patron's consumption. See Art. VII of the bylaws—Patronage Capital.

"21. That the rates charged for electric service are fixed by the Board of Directors who are elected by the members. A member must be a user of electricity, and when he ceases to use the electricity, he ceases to be a member.

"22. The supply of electricity for the rural electric cooperative system is furnished entirely by the generation and transmission cooperatives which in turn get it from the Associated Electric Cooperative, Inc. with headquarters at Springfield, Missouri.

"23. The distribution cooperatives do not have exclusive service territories defined and limited by corporate charter, provisions of law, or a governmental agency. The distribution lines of the rural electric cooperatives extend into and traverse all counties in the state except St. Louis County and the City of St. Louis. There are more than 84,000 miles of R.E. A. distribution lines in the State of Missouri and the gross plant of the distribution cooperatives exceed 205 million dollars. More than 275,000 consumers receive electrical service from these distribution cooperatives. Although the distribution cooperatives do not have service territories established by law, each cooperative in many instances does have an established service area, some of which overlap adjoining territories.

"24. The five (5) relators own and operate approximately 8,500 miles of distribution lines. More than 27,000 consumers of electricity are served through these distribution lines. The areas in which the five relators provide service are located in portions of various counties as follows:

"Howard Electric Cooperative's service area extends into the following counties: Chariton, Howard and Randolph.

"Ralls County Electric Cooperative's service area extends into the following counties: Audrain, Marion, Monroe, Pike and Ralls.

"Callaway Electric Cooperative's service area extends into the following counties: Callaway, Montgomery.

"Intercounty Electric Cooperative Association's service area extends into the following counties: Texas, Shannon, Dent, Phelps, Crawford, Maries, Pulaski and Gasconade.

"Central Missouri Electric Cooperative's service area extends into the following counties: Saline, Pettis, and Benton.

"25. That funds required for the construction of Relators' facilities to provide electric service for unserved persons in rural areas were and are still being obtained from the Rural Electrification Administration of the United States Department of Agriculture. The notes and deeds of trust securing the same are by law exempt from regulation.

"26. That service is provided by Relators in the following ways. Unserved persons desiring electric service make application for membership and pay a set membership fee which for most cooperatives is Five Dollars ($5.00). In some instances a deposit may be required as a guarantee for payment for electric service. Applications are subject to approval or disapproval by the board of directors of the respective cooperative, and consumers become members upon complying with reasonable requirements for receiving electrical service as provided by statutes and the by-laws of the corporation. When approved persons have applied for service in sufficient numbers to make it feasible for the respective cooperative to extend its lines, its board of directors directs that an application be made to the Rural Electrification Administration for an allotment of funds to build the number of miles of electric lines deemed necessary to serve all such new members, and such application for a loan is then made. Upon the approval of the loan application by the Rural Electrification Administration, the respective cooperative builds the necessary lines or extends existing lines to serve all such new members whose premises are wired for service.

"27. That Relators have constructed, maintained and operated electric distribution lines to supply electricity to those authorized by law, along, across, upon and over public thoroughfares subject to restrictions imposed by respective authorities having jurisdiction thereof; that only a small percentage of the distribution lines are located on public right-of-ways, and most of the lines are on private lands. Eminent domain has not been used to obtain easements by said Relators, although the exercise of the power of eminent domain is authorized by statute.

"28. That distribution lines are made of poles, wires, insulators and other accessories normally used in connection with lines carrying electricity by municipalities to their customers, cooperatives to their members or public investor type utilities to their customers.

"29. That the five named rural electric cooperatives are representative of the other thirty-five rural electric distribution cooperatives of the State of Missouri and truly represent them as a class.

"30. That each of the relators and each of the rural electric cooperatives represented by them as a class have been granted by the Bureau of Internal Revenue, U. S. Treasury Department, Washington, D. C.

an exemption from filing federal income tax returns.

"31. Relators and all of the rural electric cooperatives in Missouri whom they represent as a class receive all of their debt financing from the United States of America acting through the Rural Electrification Administration. By the Rural Electrification Act of 1936 as amended, the Government is authorized to loan money to these rural electric cooperatives for the furnishing of electric energy to persons who are not receiving central station service defined in that Act as: As used in this chapter the term 'rural area' shall be deemed to mean any area of the United States not included within the boundaries of any city, village, or borough having a population in excess of fifteen hundred inhabitants, and such term shall be deemed to include both the farm and nonfarm population thereof; . . .

"32. Furthermore, 'The Rural Electric Cooperative Law of Missouri,' Chapter 394, R.S.Mo. under which all of the rural electric cooperatives are operating, also provides that such rural electric cooperatives may serve in rural areas and a rural area is defined in that law as: 'Rural area' shall be deemed to mean any area of the United States not included within the boundaries of any city, town or village having a population in excess of fifteen hundred inhabitants, and such term shall be deemed to include both the farm and nonfarm population thereof."

The statutory authority relied upon by the State Tax Commission for the assessment of the "distributable" property of the relators is § 138.420, conferring upon the State Tax Commission the "exclusive power of original assessment of railroads, railroad cars, rolling stock, street railroads, bridges, telegraph, telephone, express companies, and other similar public utility corporations, companies and firms," and § 153.030, RSMo 1969, V.A.M.S., which provides for the levying and collecting of taxes upon the property of "electric power and light companies" and "electric trans-

mission lines" "in the manner as is now or may hereafter be provided by law for the taxation of railroad property in this state * * *."

The trial court found that the relators' facilities were indistinguishable from those of other electric utility companies. It concluded:

"It is apparent that the framers of the Constitution of 1945 intended that all property was to be taxed solely on the nature and characteristics of the property and not on the nature of the business of the owner. The legislature, in repealing the old law, and re-enacting the revenue statutes [Chapters 138, 151 and 153, RSMo] in their present form, recognized that the old statutes as they had been interpreted were inconsistent with the Constitution of 1945 and would be void after July 1, 1946. If this were not so, it would not have been necessary to repeal the existing statutes and re-enact them in their present form with an emergency clause.

"Relators are public utility corporations within the wording and intent of Section 138.420 and Chapter 153, RSMo.

"This Court now adjudges and declares that the State Tax Commission has the authority and duty to exercise the exclusive power of original assessment of the distributable property owned and operated by Relators rendering electrical service."

The assessment scheme here involved had its origin in an 1871 legislative enactment which conferred the duty of assessing railroad property on the state board of equalization. Laws of Mo. 1871, p. 56. The value of the lands, workshops, depots and other buildings was to be apportioned to the county and city in which such property was located and the value of all other property, including roadbed, engines and cars, was to be apportioned to counties and cities on a mileage basis. This latter class of property became known as "distributable" property. See State ex rel. Hayes v. Hannibal and St. J. R. Co., 135 Mo. 618,

637, 37 S.W. 532. In 1877, the assessment of the local, as distinguished from the distributable, property of the railroad was placed in the hands of the local assessors. Laws of Mo. 1877, p. 366.

An 1877 enactment made toll bridges and the property of telegraph and express companies subject to assessment and levy of taxes in the manner provided for railroad property. Laws of Mo. 1877, p. 391. In 1901, telephone companies were included in the operations to be so assessed and taxed. Laws of Mo. 1901, p. 223.

The State Tax Commission was established in 1917. Laws of Mo. 1917, p. 542. Section 20 of that act provided, in part:

"It shall be the duty of the commission, and the commissioners shall have power and authority, subject to the right of the state board of equalization finally to adjust and equalize the values of real and personal property among the several counties of the state, as follows:

\* \* \* \* \* \*

"(6) The commission shall have the exclusive power of original assessment of railroads, railroad cars, rolling stock, street railroads, bridges, telegraph, telephone, express companies, and other similar public utility corporations, companies, and firms, now possessed and exercised by the state board·of equalization. \* \* \* "

In 1923, "electric power and light companies," "electric transmission lines," and "oil pipe lines" were subjected to the levy and collection of taxes in the same manner as railroad property. Laws of Mo. 1923, p. 372.

In the case of State ex rel. Buchanan County Power Transmission Co. v. Baker, 320 Mo. 1146, 9 S.W.2d 589, the application of the 1923 enactment was considered. Buchanan County Power Transmission Company purchased and took delivery in Missouri of electric power from a Kansas utility. The power so purchased was transmitted over Buchanan's line, located on a private right of way and in Buchanan

County only, to its sole customer, the St. Joseph Railway, Light, Heat & Power Company, which purchased the power so delivered. Buchanan did not hold itself out as providing service to the public; it had never asserted any right of eminent domain, and had sought no franchise for its operation. This court stated the proposition presented to it as follows (9 S.W.2d 591):

"Relator's electric transmission line is subject to taxation. The question for solution is the location of the authority to assess said property. Respondents· contend it is lodged with the tax commission, and relator contends it is lodged with the county assessor. If it is a public utility, the tax commission has authority to assess it. If it is not a public utility, we are to determine with whom the authority is lodged."

Upon consideration of Buchanan's operation, the court concluded that it was not a public utility. 9 S.W.2d 592.

The court then considered the alternative proposition that the 1923 enactment gave the commission assessment authority over Buchanan, whether or not Buchanan was a public utility. Relying upon an earlier decision in State ex rel. Laclede Land & Improvement Co. v. State Tax Commission, 295 Mo. 298, 243 S.W. 887, in which it was held that § 10 of Article X of the Constitution of Missouri, 1875, prevented the granting of authority to assess purely local property to the State Tax Commission, the court held that the 1923 act giving the commission authority to assess electric companies and transmission lines should be construed, in order to make it constitutional, as intended by the legislature to "confer upon the tax commission the power of original assessment over only public utilities." 9 S.W.2d 593.

The enactment of the federal Rural Electrification Act of 1936 (Title 7 U.S.C. § 901 et seq.) brought cooperative companies into the electric business in Missouri, beginning around 1936. Originally, such companies were organized under the agri-

cultural cooperative law, now Chapter 357, RSMo 1969, V.A.M.S. In State on inf. Huffman v. Sho-Me Power Co-op., 354 Mo. 892, 191 S.W.2d 971, this court held that a corporation organized under the agricultural cooperative law was not authorized to engage in the electric light and power business.

In 1938, the attorney general, in response to a request from the State Tax Commission, issued an opinion in which he concluded that the commission had no authority to assess cooperative electrical companies organized under the agricultural cooperative act because they were not public utilities.

In 1939, (Laws of Mo. 1939, p. 298), the General Assembly enacted in substantially its present form, "The Rural Electric Cooperative Law," governing the formation and operation of rural electric cooperatives. Chapter 394, RSMo 1969, V.A.M.S. The cooperatives here involved are operating under that law.

The 1945 Constitution produced numerous changes in the tax structure of the state. The state board of equalization (§ 18, Art. X, Const. of Mo. 1875) was abolished. A new three-element classification of property for tax purposes was established: 1. Real property. 2. Tangible personal property. 3. Intangible personal property. § 4(a), Art. X, Const. of Mo. 1945, V.A.M.S. These, and other constitutional changes, necessitated wholesale revision of taxing statutes in order to avoid conflict with the new constitution with a July 1, 1946 deadline for repeal or amendment to conform with the new constitution. § 2, Schedule, Const. of Mo., 1945, V.A.M.S.

Because it fell heir to many of the duties previously imposed upon the state board of equalization (§ 14, Art. X, Const. of Mo. 1945), the statutes relating to the State Tax Commission were extensively overhauled. However, the provision of the 1917 act, above referred to, which conferred upon the tax commission the duty to

assess railroad property "and other similar public utility corporations" was not altered, except by deletion of reference to the authority previously exercised by the state board of equalization. Laws of Mo. 1945, p. 1805, § 15. See 138.420, subd. 1., RSMo 1969, V.A.M.S.

What is now 153.030, RSMo 1969, V.A.M.S., was also revised, but the reference to "electric power and light companies, electric transmission lines" was in no manner altered. Laws of Mo. 1945, p. 1852.

No action, on either the legislative or administrative front, to alter the scheme for assessment of property of rural electric cooperatives appears to have been taken following the attorney general's 1938 opinion until 1962, when the State Tax Commission again requested an opinion of the attorney general on the subject. That request resulted in an opinion that the commission had original jurisdiction to assess the distributable property of rural electric cooperatives. This litigation followed.

This legislative and administrative history is significant on the issue of whether or not the jurisdiction of the State Tax Commission to assess the distributable property of electric power and light companies is limited to such companies which are public utilities. In the Buchanan County Power Transmission Company case, supra, this court held that the authority of the State Tax Commission was so limited. Although it undertook to deal with the statutes involved in that case on several subsequent occasions, the General Assembly took no action to enlarge the authority of the commission. If, as respondents contend, the basis of the decision in Buchanan was undercut when the Supreme Court subsequently concluded in Brinkerhoff-Faris Trust & Sav. Co. v. Hill, 323 Mo. 180, 19 S.W.2d 746, that § 10 of Article X, Constitution of Missouri, 1875, did not prevent a grant of authority to the State Tax Commission to assess local property, the legislature continued to re-enact, without change, the limitation of the general grant of power of original assessment to "other similar

public utility corporations," a provision noted and quoted in the Buchanan County case. The Buchanan County case was never expressly overruled, but the constitutional provision relied on in that case was eliminated from the 1945 constitution. Nevertheless, the General Assembly thereafter took no steps to remove the statutory indication of its intention to restrict the authority of the tax commission to the assessment of public utilities.

The law applicable in these circumstances is stated in 50 Am.Jur. Statutes, § 326, pp. 318–319, as follows:

" * * * The fact that the legislature has not seen fit by amendment to express disapproval of a contemporaneous or judicial interpretation of a particular statute, has been referred to as bolstering such construction of the statute, or as persuasive evidence of the adoption of the judicial construction. In this respect, it has been declared that where a judicial construction has been placed upon the language of a statute for a long period of time, so that there has been abundant opportunity for the lawmaking power to give further expression to its will, the failure to do so amounts to legislative approval and ratification of the construction placed upon the statute by the courts, and that such construction should generally be adhered to, leaving it to the legislature to amend the law should a change be deemed necessary."

■ In the circumstances here presented, the General Assembly must be presumed to have accepted the judicial and administrative construction of its enactments by which the authority of the State Tax Commission to make original assessment of distributable property is limited to public utility companies.

The respondents assert that construction of §§ 138.420 and 153.030, supra, to exclude rural electric cooperatives from the original assessing jurisdiction of the State Tax Commission would produce an unconstitutional classification of property, in violation of § 4(a) of Art. X, Const. of Mo., 1945, V.A.M.S., which provides:

"All taxable property shall be classified for tax purposes as follows: class 1, real property; class 2, tangible personal property; class 3, intangible personal property. The general assembly, by general law, may provide for further classification within classes 2 and 3, based solely on the nature and characteristics of the property, and not on the nature, residence or business of the owner, or the amount owned. Nothing in this section shall prevent the taxing of franchises, privileges or incomes, or the levying of excise or motor vehicle license taxes, or any other taxes of the same or different types."

This case concerns only the assessment of certain property for purpose of taxation. Assessment is only one step in the taxation of property. § 3 of Article X deals with assessment of property for taxation as follows:

"Taxes may be levied and collected for public purposes only, and shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax. All taxes shall be levied and collected by general laws and shall be payable during the fiscal or calendar year in which the property is assessed. Except as otherwise provided in this constitution, the methods of determining the value of property for taxation shall be fixed by law."

■ A difference in methods of assessment does not produce subclassification of property in violation of § 4(a) of Art. X. Cupples Hesse Corporation v. State Tax Commission, Mo.Sup., 329 S.W.2d 696, 699[2].

This conclusion calls for rejection of the trial court's theory that in the repeal and re-enactment, with an emergency clause declaring the necessity to comply with the requirements of the 1945 Constitution (see Laws of Mo. 1945, p. 1837), of the here relevant provisions of what are now §§ 138.420 and 153.030, RSMo, the General

Assembly, without changing the applicable statutory language in any respect, sought to nullify the construction which those provisions had previously been given. As above demonstrated, the 1945 Constitution did require extensive overhaul of the revenue laws and emergency clauses were frequently required in order to make the statutes become effective in time to meet the new constitutional changes. Nothing supports the conclusion that, in the absence of changes in the provisions here involved, the General Assembly, nevertheless, intended to enlarge the authority of the State Tax Commission.

The question remains whether or not the relator electric cooperatives are public utilities within the scope of the commission's power of original assessment.

By § 394.160, RSMo 1969, V.A.M.S., the Public Service Commission has jurisdiction over rural electric cooperatives "so far as concerns the construction, maintenance and. operation of the physical equipment of such cooperative along, upon, under or across the public thoroughfares or upon, under or across the publicly owned lands, and to the extent of providing for the safety of the public and the elimination or lessening of induction or electrical interference, but only to the extent provided in this section, and nothing herein contained shall be construed as conferring upon such commission jurisdiction over the service, rates, financing, accounting or management of any such cooperative." The respondents do not rely upon this limited grant to the Public Service Commission of jurisdiction over electric cooperatives as evidencing a legislative declaration that such cooperatives are public utilities. Tacitly, they appear to concede that this statute does not establish the status of rural electric cooperatives as public utilities. Rather, the respondents rely on definition and description of "public utilities" as applied by the courts in cases in which the status of an operation providing electric and similar service has been in issue.

As above noted, the question of whether or not an electric service operation was a public utility for purposes of assessment jurisdiction of the State Tax Commission was considered in State ex rel. Buchanan County Power Transmission Co. v. Baker, 320 Mo. 1146, 9 S.W.2d 589. In that case, the absence of evidence that the company was serving the public was the decisive factor in the court's concluding that it was not a public utility. See also State ex rel. Danciger v. Public Service Commission, 275 Mo. 483, 205 S.W. 36; State ex rel. Lohman & Farmers' Mutual Telephone Co. v. Brown, Public Service Commission, 323 Mo. 818, 19 S.W.2d 1048; State ex rel. Cirese v. Public Service Commission, Mo. App., 178 S.W.2d 788.

The relators here contend that they have no authority to serve the public generally because by law they are limited to serving only their members, governmental agencies and political subdivisions and other persons not exceeding 10% of the number of their members. § 394.080(4), RSMo 1969, V.A. M.S. Paragraph 13 of the stipulated facts recites that, in addition to the statutory qualification that members must agree to use electricity furnished by relators, "Relators' by-laws provide additional qualifications for membership, which includes (sic) provisions for termination of membership, and reserves (sic) the right to select its members." The stipulated facts also recite that relators hold themselves out as willing to serve only those consumers of electricity specified in § 394.080(4).

The limitation of authority of electric cooperatives to serve only their members has been held to exclude such companies from regulation as public utilities under statutory regulatory schemes applicable to public utilities. Among cases so holding are Garkane Power Co., Inc. v. Public Service Commission, 98 Utah 466, 100 P.2d 571, and Inland Empire Rural Electrification, Inc. v. Department of Public Service of Washington, 199 Wash. 527, 92 P.2d 258. Such feature has also been found sig-

nificant in service disputes between cooperatives and private utilities in cases where the jurisdiction of the regulatory authority is limited to disputes between "public utilities." In Socorro Electric Cooperative, Inc. v. Public Service Co., 66 N.M. 343, 348 P.2d 88, and San Miguel Power Association v. Public Service Commission, 4 Utah 2d 252, 292 P.2d 511, and Louisiana Power & Light Company v. Louisiana Public Service Commission, 250 La. 596, 197 So.2d 638, the limitation of service to members of cooperatives was held to preclude their being "public utilities," entitled to protest the grant to, or assumption of service rights by regulated utilities.

In the case of Rural Electric Co. v. State Board of Equalization, 57 Wyo. 451, 120 P.2d 741, 122 P.2d 189, the court rejected the claim of an electric cooperative that it was not a public utility within the meaning and definition of a law imposing a tax upon the gross receipts of "public utilities, gas, electric, and heat corporations" as defined in the state public service commission law. The court did not consider the limitation of service to "members" important in its determination. 57 Wyo. 471-473, 120 P.2d 741. See also Alabama Power Co. v. Cullman County Electric Membership Corporation, 234 Ala. 396, 174 So. 866.

Respondents assert that the service to members only is not significant because the only qualification for membership is that a person agree to use power supplied by the cooperative and comply with the reasonable requirements of the cooperative. Respondents assert that such requirements differ little, if any, from conditions imposed by regulated utilities upon their customers. Nothing by way of evidence appears in this record to provide the basis for a comparison of the requirements of the cooperatives and of other electric companies in order to obtain electric service. The cooperative by-laws introduced in evidence do require approval of membership applications by either the board of directors or members and require members to abide by the rules and regulations of the board of directors. Provision is also made for the expulsion of members.

The respondents also argue that by the terms of loan agreements with the Rural Electrification Administration, the cooperatives are required to "make diligent effort to extend electric service to all unserved persons within the service area of the [cooperative] who (a) desire such service and (b) meet all reasonable requirements established by the [cooperative] as a condition of such service." In the case of San Miguel Power Association v. Public Service Commission, supra, the court did not consider that such requirement imposed a duty of providing service to the public generally. The court there concluded that the fact that membership was easily obtained did not alter the fact that members only were entitled to obtain service. On the other hand, in Dairyland Power Cooperative v. Brennan, 248 Minn. 556, 82 N.W.2d 56, in an attack upon the right of a generating and transmission cooperative to exercise the power of eminent domain, the court considered the requirements of the R.E.A. loan contract that service be extended on an area coverage basis a significant factor in concluding that the cooperative was "in the fabric of its organization and in the functions it performs, a public utility in fact."

Respondents also point to cases in which courts have held that a cooperative, in any event, does not have the right to deny membership, and therefore service, arbitrarily. In the case of Capital Electric Power Association v. McGuffee, 226 Miss. 227, 83 So.2d 837, the court held that a cooperative had no right to refuse service to the tenant of the owner of property with whom the cooperative was engaged in litigation. The court held that an electric cooperative, enjoying the right of eminent domain and the privilege of using public right of way and other privileges conferred by law, by acceptance of its charter, had an obligation to render nondiscriminatory service to persons subscribing for

such service who live in area served by the cooperative. The court refrained from determining whether the cooperative was a "public utility" within the purview of public utility regulatory statutes.

On the other hand, a by-law imposing upon cooperative members obligations to provide right of way for cooperative lines was held binding and expulsion of a member for refusal to abide by such by-law was sustained in King v. Farmers Electric Co-op., 56 N.M. 552, 246 P.2d 1041. In Sutton v. Hunziker, 75 Idaho 395, 272 P.2d 1012, the reasonableness of such a by-law was held for the jury in an action by a member whose service had been terminated because he declined to provide a right of way. Those cases would support the conclusion that conditions may be imposed upon membership in cooperatives different from those which could be made by regulated utilities on their customers.

In cases in which the right of an electric cooperative to exercise the power of eminent domain has been questioned on the grounds that limitations upon the cooperative's services to members only precludes such cooperatives taking property for a "public use" or "public purpose," courts have held that such limitation does not preclude the exercise of the power of eminent domain. In Bookhart v. Central Electric Power Cooperative, Inc., 219 S.C. 414, 65 S.E.2d 781, a cooperative exempt from P. S.C. regulation was held "public in its nature and purpose, with the expressly delegated power of eminent domain, which inevitably results in the obligation to reasonably render nondiscriminatory service." 65 S.E.2d 785. In Dairyland Power Cooperative v. Brennan, supra, the court dismissed the limitation of service to members only in view of the fact that all applications for membership had been accepted. In McCrady v. Western Farmers Electric Cooperative, Okl., 323 P.2d 356, the court held that the fact that a cooperative could serve members only did not mean that a cooperative could arbitrarily exclude any citizen within its distribution area, and

that, since a cooperative could not arbitrarily exclude members, the attack upon the grant to it of the power of eminent domain was without merit.

The one conclusion to be drawn from these and other cases which have dealt with the status of rural electric cooperatives such as those here involved is that there is no one, simple, all-inclusive test for determining whether or not such corporations are to be considered public utilities. It is clear that the limitation of the right of rural electric cooperatives to serve members presents a situation inconsistent with the generally accepted theory that a public utility is required to serve all who seek its service. The record in this case does not justify the conclusion that the limitation of service to members is a meaningless restriction.

In any event, the operation of the relators is not so clearly that of a public utility as to justify the respondents' assuming to determine that they are entrusted with the authority to assess the relator's distributable property. From the time of the 1938 attorney general's opinion until 1962, the State Tax Commission asserted no authority to assess rural cooperatives. Respondents say that the 1938 opinion is of no significance because it was issued prior to the adoption of the R.E.A. cooperative law in 1939, and at the time of such opinion the electric cooperatives organized and operating under the agricultural marketing cooperative act did not have charter power to serve the public, the right to use the public streets, and the right of eminent domain, all of which, respondents assert, were conferred upon cooperatives operating under the 1939 act. However, the tax commission did not consider those claimed additional powers of such significance as to alter the status of the cooperatives for the purpose of tax assessment for some 23 years.

The administrative construction of its authority by the tax commission, coupled with the legislative acceptance of such

construction, militate strongly against the conclusion that the commission should now assume to assess the relators as they do electric public utility companies. The statute under which the respondents propose to act is not so clear and free from doubt as to preclude the giving of weight to the long period of construction which it has received at the hands of the tax commission and the General Assembly. State ex rel. Chick v. Davis, 273 Mo. 660, 201 S.W. 529; State ex rel. Harline v. Public Service Commission of Missouri, Mo.App., 343 S.W.2d 177, 182[9].

Among the trial court's findings and one of the arguments here advanced by respondents in support of the trial court's judgment was the fact that Associated Electric Co-operative Inc., a cooperative whose members are the six transmission cooperatives, whose members, in turn, are the distribution cooperatives here involved, either directly or as member of a class, is the member of a power pool, by which the facilities of Associated and its members are connected with sources of power supplied by regulated private utilities and municipal utilities of the state. Associated Electric Co-operative is the source of the electrical energy furnished to the members and customers of the distribution cooperatives. Respondents urge that this arrangement is significant in view of the observation of the court in Buchanan County Power Transmission Co. v. Baker, supra, that "a different question for solution" would have been presented had it been shown that Buchanan was "an important link" in the sale and distribution of electric energy by a public utility.

The parties have stipulated that there is another case pending involving the authority of respondents to assess "rural electric cooperatives whose business it is to generate electricity and transmit it as wholesaler to relators who distribute it as a retailer to those members." Without in any manner indicating any view of the merits of that case, that is the case in which the power pool might be of significance. That whole arrangement deals with the source of the energy distributed by the relators and does not determine their status in the distribution and sale of the energy so obtained.

The trial court also considered significant that the lines of each of the relators crossed county boundaries. However, nowhere in the statutes conferring assessment authority on the tax commission is the crossing of county boundaries made a basis for the commission's exercise of its authority and that fact is without significance in this case.

The judgment of the trial court is reversed and the cause remanded with direction to enter judgment making the preliminary writ in prohibition absolute.

HIGGINS, C., not sitting.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

HOLMAN, P. J., SEILER, J., and RICKHOFF, Special Judge, concur.

BARDGETT, J., not sitting.