Regina **HELMING**, Respondent,

v.

John **ADAMS**, Appellant.

No. KCD 26335.

Missouri Court of Appeals, Kansas City District.

April 1, 1974.

Motion for Rehearing and/or Transfer Denied May 6, 1974.

Woolsey & Yarger, Versaille, for appellant.

Carson, Inglish, Monaco & Coil, Michael P. Riley, Jefferson City, for respondent.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

PER CURIAM:

This is an appeal from a judgment entered pursuant to a jury verdict in favor of plaintiff-respondent awarding her actual

damages of $213.00 and punitive damages of $2,500.00, in an action for false imprisonment against defendant-appellant. The parties will hereinafter be designated, respectively, plaintiff and defendant.

Defendant vies on appeal that the judgment should be reversed and the case remanded for a new trial for five reasons:

I. The trial court erred in refusing to give either Instruction D–2 or D–3, requested by defendant, thus depriving defendant of the "defense of probable cause although evidence of probable cause and justification had been pleaded and proven."

II. The trial court erred in giving Instruction No. 5, a punitive damage instruction, absent evidence to support it, and absent the incorporation of or an accompanying definition of malice.

III. The trial court erred in refusing to admit defendant's Exhibits 1, 2, 3 and 4, photographs of the scene of an alleged assault pertinent to the issues drawn in the case.

IV. The trial court erred in refusing to give Instruction D–1, a withdrawal instruction requested by defendant regarding damage to plaintiff's nervous system, since all the evidence disclosed that any such damage resulted from causes other than acts of defendant.

V. The verdict was excessive and resulted from passion, prejudice or bias on the part of the jury.

The following facts are set forth, since they are indispensable to the proper resolve of defendant's assignments of error.

On June 27, 1971, between 8:00 and 8:30 P.M., defendant, a district supervisor, and Richard Schroeder, an agent, for the Missouri Conservation Commission, were seated in Schroeder's state owned automobile, which was parked on a dirt side road in Cole County. More particularly, the automobile was parked in a general area described as "down in the Claysville Road area, down the upper Cole Junction bottoms". This area was in the near vicinity of the Church Prison Farm, a unit of the Missouri Department of Corrections. At that time defendant and Schroeder observed an automobile containing three people drive past them, headed north, on the Claysville Road, which ran perpendicular to the dirt side road they were parked on. This automobile stopped and parked some forty to sixty feet from the dirt side road. Two males emerged from the automobile after it stopped, Calvin Huckabee, the driver, and Stanley Helming, one of the two passengers. Plaintiff, the other passenger, remained inside the automobile at all times. Defendant and Schroeder were on "routine patrol" at the time in question.

When Huckabee got out of the car he was carrying a .22 caliber rifle. He walked over to a nearby mulberry tree in hopes of finding some squirrels to shoot. No squirrels appeared and no shots were ever fired by Huckabee. When Stanley Helming got out of the car, he proceeded down the road on foot, around a bend, for the purpose of viewing the scene of a recent fatal train accident.

During the interim, defendant and Schroeder got out of their automobile, and defendant quietly followed and observed Stanley Helming from the wooded area that paralleled the Claysville Road, while Schroeder remained at the car and kept Huckabee under surveillance. After some ten or fifteen minutes, Stanley Helming and Huckabee returned to and re-entered their parked car, which plaintiff was still sitting in. Huckabee, as driver, with plaintiff sitting in the front seat, right hand side, and Stanley Helming seated in the rear, started the car up and drove forward a short distance down the road and then proceeded to turn the car around to proceed home. According to the plaintiff's evidence it was "haze dark" at the time. On the other hand, according to defendant's evidence, it was still light out.

As the car driven by Huckabee started up the road, after turning around, the oc-

cupants of the car "heard a noise in the wooded area like somebody was walking." Huckebee asked plaintiff if she heard the noise and she answered, "We are awfully close to the prison farm, it could be an inmate." Plaintiff also said, "We better leave." As the car proceeded on up the road, plaintiff for the first time observed agent Schroeder. She did not know who he was. According to plaintiff's evidence neither she, nor any of the other occupants of the car, observed any badge or name tag on Schroeder indicating that he was an agent of the Missouri Conservation Commission. When plaintiff saw Schroeder she said, "There is one now, looks like a convict all right" and she thought he was a convict. Schroeder was walking toward the oncoming car on the shoulder (on the car's left hand side of the road) at the time. Before the oncoming car driven by Huckabee reached Schroeder, Schroeder verbally and manually ordered the car to stop for the purpose of checking whether or not Huckabee had a "hunting permit". Huckabee accelerated the car and speeded on past Schroeder. Defendant's evidence was that in doing so the car swerved toward and struck Schroeder. Defendant's evidence further disclosed that thereafter the car "continued to come back and forth across the road at a high rate of speed." Plaintiff's evidence was that the car merely fishtailed a bit when it was accelerated and at no time ever struck Schroeder. In any event, Schroeder was not hurt or injured.

Immediately after the car passed Schroeder, he drew a Model 19, .357 Magnum, Smith and Wesson revolver issued to him by the Missouri Conservation Commission, and fired four shots into the rear of the departing car. One of the shots hit the gas tank of the departing car and another shot hit the back window and emerged through the windshield near the steering wheel. Fortunately, none of the shots struck any of the occupants of the departing car although glass from the windshield flew all over them and Huckabee and Stanley Helming were cut by the flying glass. The departing car did not stop when the shots were fired. Whereupon, defendant and Schroeder got into their automobile, turned on a red light the car was equipped with, and pursued the departing car. According to plaintiff's evidence, she looked around after the shot was fired and observed a car behind them with its red light flashing and said, "There is a red light. You had better stop." Huckabee stopped the car.

The car occupied by Schroeder and defendant pulled up behind Huckabee's car and stopped. According to defendant's evidence Schroeder drew his .357 Magnum revolver and with gun in hand approached the left hand or driver's side of the Huckabee car, while defendant, with his holster unfastened and his hand on the gun still in the holster, approached the right hand side of the car. At gun point, Schroeder ordered Huckabee out of the car and "spread eagled" him on the side of the car and searched to see if he was carrying a weapon. Defendant ordered plaintiff and Stanley Helming out of the right hand side of the car. Plaintiff's evidence was that defendant, as well as Schroeder, had his .357 Magnum revolver drawn and in his hand, and as defendant approached the car and ordered plaintiff and Stanley Helming out, defendant had his .357 Magnum revolver in his hand and pointed toward them.

According to agent Schroeder, who was called as a witness by defendant, Huckabee, the driver, when he was ordered out of the car, said to Schroeder, "I am sorry, I know I should not have done what I did, but I thought you were a convict." Schroeder proceeded to check Huckabee's identification. Contemporaneously, defendant ordered plaintiff and Stanley Helming out of the car and proceeded to check their identification at which time plaintiff, without protest of any kind, submitted her driver's license and fishing license to defendant for inspection.

Agent Schroeder, during the course of cross-examination, was asked the following questions and gave the following answers:

"Q. At the time you were down there, sir, you had not seen Regina Helming commit any violation whatsoever, had you?

A. No, I hadn't seen her."

\*　　\*　　\*　　\*　　\*　　\*

"Q. . . . Now, you were aware at the time that you fired at the automobile that this woman was there and she had done absolutely nothing. Isn't that correct?

A. As far as I can remember we didn't see her do anything."

\*　　\*　　\*　　\*　　\*　　\*

"Q. I asked you: did she violate the rules and regulations of the commission?

A. No, sir."

\*　　\*　　\*　　\*　　\*　　\*

"Q. That wasn't Regina Helming's automobile?

A. She was in it.

Q. She was in it?

A. Yes.

Q. And she didn't do any hunting: right?

A. Not that we saw.

Q. And you saw her fishing license?

A. Yes, sir.

Q. What else did you have to investigate Regina Helming for?

A. She was in this area with a car that apparently committed the act against me and we wanted to know, she might have been there against her will with these two men. So we had to hold them until we run a check on them through the Highway Patrol and these other agencies.

Q. Mr. Schroeder, you are trying to tell me you were protecting Regina Helming by taking her to jail because these people might have her out there against her will?

"A. We had no idea at that time who they were, what they were doing or why they were out there, why they would act like that.

Q. Is that why you put her under arrest, you wanted to protect her against her will?

A. We wanted to find out who she was and find out what was going on."

\*　　\*　　\*　　\*　　\*　　\*

"Q. —because you didn't have anything to investigate her for? She hadn't violated any game laws, had she?

A. Not that I knew at that time."

Defendant himself testified:

"Q. Did they commit any offense, Regina Helming?

A. No, sir."

\*　　\*　　\*　　\*　　\*　　\*

"Q. And we can certainly agree that there was no charge brought against them in any way?

A. No, sir."

\*　　\*　　\*　　\*　　\*　　\*

"Q. We can also agree, can't we, that you didn't have any warrant for their arrest?

A. No, sir.

Q. And nobody else did that you know of?

A. No, sir."

The evidence of both plaintiff and defendant disclosed that plaintiff was arrested by defendant, along with Huckabee and Stanley Helming, and all three were taken to the Cole County jail by defendant and agent Schroeder, where plaintiff was physically confined from 9:17 P.M. until between 11:03 and 11:25 P.M. the evening of June 27, 1971.

No criminal charges of any kind were ever filed against plaintiff.

At the time in question plaintiff was employed by a dry cleaning establishment in Jefferson City, Missouri. She worked ten hours a day at the rate of $1.75 per hour. According to her testimony, she missed three or four days of work following June 27, 1971, and subsequently missed "a few days" additional work because her "nerves was shot". She also suffered humiliation and embarrassment because of her arrest and confinement. When defendant first ordered plaintiff out of the car at the scene, she told him she would "get out as soon as my legs quit shaking". On cross-examination plaintiff testified that prior to the incident in question she was "some nervous but this made me a lot nervouser." Further, on cross-examination, plaintiff testified that she became nervous as a result of being arrested by defendant. Plaintiff also admitted on cross-examination that as she grew older it seemed like she became more nervous and that her present nervous condition "might be. I don't know" the result of getting a little older each year.

Defendant, in his amended answer to plaintiff's petition, among other things, pleaded "that any restraint of plaintiff by defendant, which defendant denies, was by reason of plaintiff having been a companion and accessory to one Calvin Huckabee who had, immediately prior to said restraint, in the view of defendant, committed an *apparent* felony, to-wit, an assault with intent to do great bodily harm." (Emphasis added.) In his motion for new trial defendant alleged that his motion for a directed verdict should have been sustained because at all times he acted "upon probable cause and in a reasonable manner." In his brief on appeal defendant alleged "after these observations he certainly had reasonable cause to believe that the occupants of the vehicle had committed a crime." The aforementioned indicate that defendant's theory of the case, both during trial and on appeal, was that he was fully justified in arresting and confining plaintiff without a warrant if he had (1) proba-

ble cause to believe that a felony had been committed, and (2) probable cause to believe that plaintiff aided or abetted in its perpetration.

It is impossible to judicially resolve Point I until several ancillary determinations have been made. First, was defendant legally empowered under the prevailing law and applicable facts to effect a warrantless arrest of plaintiff? Second, what is the import of refused Instructions D–2 and D–3? In the context of this latter consideration, defendant will be given the benefit of the most favorable interpretation possible. D–2 directed a verdict for defendant if he had reasonable grounds to believe that a felony was committed and reasonable grounds to believe that plaintiff committed it. When D–2 was refused by the trial court, defendant obviously fell back on D–3, which was also refused. D–3 directed a verdict for the defendant if a felony was committed and plaintiff committed it.

■ Defendant, in his capacity as district supervisor for the Missouri Conservation Commission, was statutorily endowed with a limited right to arrest without a warrant. Section 252.080, RSMo 1969, V. A.M.S. provides, in part, "Any such agent may arrest, without warrant, any person caught by him or in his view violating or who he has good reason to believe is violating, or has violated this law or any such rules and regulations, and take such person forthwith before a magistrate or any court having jurisdiction, who shall proceed without delay to hear, try and determine the matter as in other criminal cases." A companion statute, Section 252.060, RSMo 1969, V.A.M.S. provides that agents of the Missouri Conservation Commission have authority to request persons holding a license or permit issued by the Missouri Conservation Commission to submit same to the agent for inspection and failure of such person to do so, after being requested, is a misdemeanor. Suffice it to say, all of the evidence in this case, that of defendant, as well as that of plaintiff, con-

clusively discloses that neither Section 252.080, supra, nor Section 252.060, supra, constituted authority for defendant to arrest plaintiff without a warrant.

In view of the above, defendant necessarily retreated to the status of a private citizen in order to attempt to justify his warrantless arrest and confinement of plaintiff. Missouri cases espousing the right of private citizens to arrest without warrant constitute a labyrinth in Missouri law. In Pandjiris v. Hartman, 196 Mo. 539, 546, 94 S.W. 270, 272 (1906), an action for false arrest and imprisonment against a private citizen, the court held:

"In such case it is no answer to the plaintiff's demand for damages for the defendant to say: 'I had reasonable cause to believe the plaintiff was guilty. I acted without malice. I took the advice of counsel learned in the law.' *The only plea of justification or excuse is that plaintiff was guilty of the crime for which he was arrested.*" (Emphasis added.)

For many years *Pandjiris* was recognized as standing for the proposition that a private citizen was not permitted to effect a warrantless arrest until an offense, in fact, had been or was in the process of being committed, and the person arrested was, in fact, the perpetrator of the offense. Probable cause or reasonable grounds to believe that an offense had been or was being committed by the person arrested was not sufficient to justify or authorize a warrantless arrest by a private citizen. See also Leve v. Putting, Mo.App., 196 S.W. 1060 (1917) and Titus v. Montgomery Ward and Co., 232 Mo.App. 987, 123 S.W. 2d 574 (1938). *Pandjiris*, however, was qualified in Teel v. May Department Stores Co., 348 Mo. 696, 155 S.W.2d 74 (1941), a suit for false arrest and imprisonment arising from the plaintiff's warrantless arrest by an employee of defendant's department store. In *Teel*, the court, relying upon a California case, Collyer v. S. H. Kress & Co., 5 Cal.2d 175, 54 P.2d 20 (1936), held that the need for protecting one's property outbalanced the need for protecting personal liberty to the extent that a private citizen could effect a warrantless arrest on the existence of probable cause or reasonable grounds, both as to the offense and as to the person arrested, where the arresting party's property was involved. The principle enunciated in *Teel*, with certain limitations, was codified by the Missouri General Assembly in 1961 and presently constitutes Section 537.125 RSMo 1969, V.A.M.S. Apparently *Pandjiris* was additionally qualified in State v. Parker, 378 S.W.2d 274 (Mo.App.1964), which indicates that a private citizen has the right to effect a warrantless arrest to prevent a breach of peace or an affray taking place in his presence.

■ The above has been presented essentially for the purpose of laying a background in view of more recent cases such as State v. Keeny, 431 S.W.2d 95, 97 (Mo. 1968); State v. Goodman, 449 S.W.2d 656, 659 (Mo.1970), and State v. Fritz, 490 S. W.2d 30, 32 (Mo.1973), cert. den., 411 U.S. 985, 93 S.Ct. 2282, 36 L.Ed.2d 962. In light of these decisions, the right of a private citizen to effect a warrantless arrest (assuming such does not fall within the authority granted merchants and their employees by Section 537.125, supra) now appears to fall somewhere between *Pandjiris* and *Teel*. As stated in State v. Fritz, supra, 490 S.W.2d 1. c. 32: ". . . (I)n Missouri a private citizen may make arrest on a showing of a commission of a felony and reasonable grounds to suspect the arrested party." Thus it appears that the only affirmative defense that defendant could have relied on in this action for false imprisonment was that a felony, in fact, had been committed and the existence of reasonable grounds to believe that plaintiff was the perpetrator thereof. Reasonable grounds to believe that a felony was committed would not be sufficient, even though accompanied by the existence of reasonable grounds to believe that plaintiff perpetrated the suspected felony.

■ Refocusing attention on Instruction D–2, in conjunction with the above, the court did not err in refusing Instruc-

tion D-2, since it constituted a positive misdirection to the jury, inasmuch as it directed a verdict for defendant if he had reasonable grounds to believe that a felony had been committed. It is basic that it is not error for a trial court to refuse to give a requested instruction which is incorrect. S. W. Bell Telephone Co. v. Chester A. Dean Co., 370 S.W.2d 270 (Mo.1963); Wors v. Glasgow Village Supermarket, Inc., 460 S.W.2d 583 (Mo.1970), and Daniels v. Smith, 471 S.W.2d 508 (Mo.App. 1971).

■ The trial court's refusal to give Instruction D-2 was free of error for an additional reason. Assuming, arguendo, that Instruction D-2 was legally correct, there was not sufficient evidence to support it. See Brassfield v. Sears, 421 S.W. 2d 321 (Mo.1967). Likewise, the trial court's refusal to give Instruction D-3 (directing a verdict for defendant if a felony was committed and that plaintiff committed it) was free of error because there was not sufficient evidence to support it. Brassfield v. Sears, supra. In determining whether there was sufficient evidence to support the giving of either Instruction D-2 or Instruction D-3, the evidence is viewed "in the light most favorable to defendant" and defendant must be given "the benefit of all favorable inference reasonably deducible therefrom". Underwood v. Crosby, 447 S.W.2d 566 (Mo. banc 1969). An analysis of the evidence in this case, accordingly, leads to the inescapable conclusion that plaintiff, in fact, committed no felony; analysis of the evidence, accordingly, leads to the further inescapable conclusion that no reasonable grounds existed for defendant to believe that plaintiff committed a felony. Defendant argues that when the car driven by Huckabee and occupied by plaintiff and Stanley Helming swerved and struck Schroeder, as testified to by Schroeder, a felony was committed in his presence, or he had reasonable grounds to believe that a felony was committed, namely, a violation of Section 559.190 RSMo 1969, V.A.M.S., (Felonious assault without malice aforethought). Granted that an automobile may constitute an instrumentality for committing an assault in violation of Section 559.190, supra, [See State v. Garner, 360 Mo. 50, 226 S. W.2d 604 (1950)], there is not the slightest scintilla of evidence in this case, viewed in the light most favorable to defendant and giving him the benefit of all reasonably deducible inferences, that plaintiff, who was a passenger in the automobile, aided, abetted, affirmatively participated with or encouraged Huckabee to swerve the automobile he was driving at or toward Schroeder. This lack of evidence to support the giving of either Instruction D-2 or D-3 is persuasively demonstrated by the holding in State v. Castaldi, 386 S.W.2d 392, 395 (Mo.1965):

". . . It is necessary that the accused 'associate himself with the venture' in some fashion, Mays v. United States, 8 Cir., 261 F.2d 662; that some form of affirmative participation be shown, State v. Butler, Mo.Sup., 310 S.W. 2d 952, 957,—participation in the crime as something that he wished to bring about; that he sought by his action to make it succeed, United States v. Peoni, 2 Cir., 100 F.2d 401, 402; that he 'consciously shared' in the criminal act. Nye & Nissen v. United States, 336 U.S. 613, 620, 69 S.Ct. 766, 770, 93 L.Ed. 919. In every case we have examined holding one guilty as an aider and abettor there has been some evidence of an act or deed or circumstance other than mere presence at the scene. There is nothing here from which it can be inferred that Castaldi encouraged or excited the commission of the offense, or participated therein, before or during the occasion when the deputy arrived, by words, gestures, looks, signs, or that he otherwise countenanced, approved or associated himself with this criminal activity, or even that he knew that a crime was being or had been committed."

Plaintiff at no time took the wheel of the automobile she was in, thereby causing it to swerve, nor did she engage in any form of "affirmative participation"; there is nothing to indicate that she "wished to

bring about" the swerving of the automobile or that she "consciously shared" in Huckabee's swerving of the automobile (and the record is far from clear that such was done intentionally by Huckabee). At best the evidence merely shows plaintiff's "mere presence at the scene". The naked fact that plaintiff suggested to Huckabee that they leave the area and mistakenly believed that Schroeder was an escapee from the Church Prison Farm lacks sheet steel to spring an inference that she aided, abetted, affirmatively participated with or encouraged Huckabee to swerve the car at or toward Schroeder. This analysis can be quickly abbreviated by pointing out that the positive testimony of defendant and his witness Schroeder heretofore quoted verbatim refutes any viable argument on defendant's part that plaintiff aided or abetted in the commission of a felony or that he had any reasonable grounds to believe that she did.

In support of Point I, defendant directs this court's attention to five Missouri cases involving false imprisonment or arrest. Parrott v. Reis, 441 S.W.2d 390 (Mo.App. 1969); Nelson v. R. H. Macy & Co., 434 S.W.2d 767 (Mo.App.1968); Vanneman v. W. T. Grant Company, 351 S.W.2d 729 (Mo.1961); Teel v. May Department Stores Co., 348 Mo. 696, 155 S.W.2d 74 (1941), and Frank v. Wabash Railroad Company, 295 S.W.2d 16 (Mo.1956). These cases must, however, be distinguished, either for the reason that they deal with "shoplifting", an area in which a merchant is afforded special protections [Nelson v. R. H. Macy & Co., supra; Vanneman v. W. T. Grant Company, supra; and Teel v. May Department Stores Co., supra] or because the questioned detention was made by a person possessing, or clothed with, the authority of a police officer in performance of his official duties [Parrott v. Reis, supra, and Frank v. Wabash Railroad Company, supra.] Neither of these situations is present here.

■ In Point II defendant claims that the trial court erred in giving Instruction No. 5, a punitive damage instruction re-

quested by plaintiff, because (1) it failed to incorporate or be accompanied by a definition of malice and, further, (2) there was no evidence to support said instruction. Defendant's bifurcated attack on Instruction No. 5 lends itself to almost summary disposal. Defendant at no time, either during trial or in his motion for a new trial, ever lodged an objection against Instruction No. 5 on the ground that it failed to incorporate or be accompanied by a definition of malice. This objection clearly was not within the ambit of defendant's objection to Instruction No. 5 in his motion for a new trial. The objection was first leveled by defendant in his brief on appeal, thereby disregarding any semblance of compliance with Rules 70.02 and 79.03, V.A.M.R. Thus, the instant objection was not properly preserved for appellate review and will not be considered. Chambers v. Kansas City, 446 S.W.2d 833 (Mo.1969).

■ Was there evidence to support the giving of an instruction (No. 5) on punitive damages? The answer to this question lies both in the evidence and the law applicable to such evidence. As heretofore demonstrated, defendant's warrantless arrest of plaintiff constituted the intentional doing of a wrongful act because plaintiff, in fact, had committed no offense of any kind, either alone or as an aider or abettor in concert with Huckabee, and no reasonable grounds existed for defendant to believe that she had. Defendant argues that even if the jury found that he falsely imprisoned plaintiff, it was "committed unintentionally and was the result of the mistake directly resulting from the acts of plaintiff and her companions." Under Missouri law submission of punitive damages is not limited to the existence of actual malice. Legal malice alone will support the submission of punitive damages. Peak v. W. T. Grant Company, 386 S.W.2d 685, 691 (Mo.App.1964); McGill v. Walnut Realty Co., 235 Mo.App. 874, 148 S.W.2d 131, 136 (1941), and Martin v. Woodlea Inv. Co., 206 Mo.App. 33, 226 S.W. 650, 653 (1920). The trial court did not err in submitting the issue of punitive damages to

the jury under the facts and applicable law governing this case.

In Point III defendant maintains that the trial court erred in refusing to admit defendant's Exhibits 1, 2, 3 and 4, photographs of the scene of the alleged assault upon agent Schroeder by means of the automobile driven by Huckabee. These photographs in no way aided defendant in proving that plaintiff committed a criminal offense of any kind, either alone or as an aider or abettor in concert with Huckabee, or in proving that defendant had reasonable grounds to believe that she had. Assuming that the photographs were otherwise admissible, their exclusion was harmless error since they in no way proved, directly or by reasonably deducible inference, that plaintiff aided or abetted Huckabee in the alleged assault, or that reasonable grounds existed for defendant to believe that plaintiff aided or abetted Huckabee in the alleged assault. See Johnson v. Lee Way Motor Freight, 261 S.W.2d 95, 98–99 (Mo.1953); Boneau v. Swift & Co., 66 S. W.2d 172, 176 (Mo.App.1934), and Prindle v. Fidelity & Casualty Co., 233 S.W. 252, 255 (Mo.App.1921).

Defendant's Point IV is addressed to his requested, but refused, withdrawal instruction (No. D–1) whereby he sought to withdraw from the jury's consideration any issue of damage to plaintiff's nervous system. The gist of defendant's position in this respect is if plaintiff "had such injury it resulted either from the aging process or the acts of agent Schroeder and not from any acts of Appellant." Defendant's position is untenable because it completely ignores plantiff's testimony brought out during cross-examination, that she was nervous *after* she was arrested by defendant. The giving of a withdrawal instruction rests within the sound discretion of the trial court, and absent an abuse of such discretion, refusal to give a withdrawal instruction constitutes no basis for complaint. Statler v. St. Louis Arena Corporation, 388 S.W.2d 833, 837 (Mo.1965) and Kasper v. Helfrich, 421 S.W.2d 66,

71 (Mo.App.1967). Although defendant's counsel in closing argument might have properly argued the effect on plaintiff's nerves of agent Schroeder's shooting into the car, and the effect of the "aging process" on plaintiff's nerves, her testimony that she was nervous *after* she was arrested by defendant insulates the trial court from any charge of abuse of discretion in refusing to give defendant's withdrawal instruction.

Defendant's final Point (V) on appeal is that the verdict was excessive and resulted from passion, prejudice or bias on the part of the jury. Plaintiff was awarded $213.00 as actual damages and $2,500.00 as punitive damages. This court concludes that under all the evidence the amount of damages awarded, both actual and punitive, were not excessive, thereby precluding defendant's contention that the verdict of the jury was the result of passion, prejudice or bias.

As to defendant's allegation of excessiveness regarding the actual damages awarded plaintiff, this court previously held in Nelson v. R. H. Macy & Co., 434 S. W.2d 767, 774 (Mo.App.1968), "that in assessing actual damages for false arrest the jury can properly consider such things as humiliation, embarrassment and disgrace and that the amount to be awarded is peculiarly within the province of the jury because they must weigh these imponderables and that appellate courts will not disturb such verdicts unless it appears the jury has abused its discretion." In *Nelson* this court, with respect to the jury's assessment of actual damages, treated false arrest and imprisonment cases as analogous to malicious prosecution cases, and, citing Carp v. Queen Ins. Co., 203 Mo. 295, 101 S.W. 78, 99 (1907), prescribed to the view of the Supreme Court that "(t)he law concedes a wide latitude of discretion to the jury in actions of this class." As to defendant's allegation of excessiveness regarding the punitive damages awarded plaintiff, the court in Wehrman v. Liberty Petroleum Company, 382 S.W.2d 56, 66 (Mo.App.

1964), very aptly stated that "(i)n view of the varigated nature of the factors to be taken into account, there is no hard and fast rule that can be adhered to" and "each case must turn more or less upon its own peculiar facts" and the amount of punitive damages "need not bear any relation" to the amount of actual damages awarded. See State ex rel. St. Joseph Belt Ry. Co. v. Shain, 341 Mo. 733, 108 S.W.2d 351, 356 (1937) exemplifying the "varigated nature of the factors" to be considered by the jury in determining punitive damages. The cardinal purpose of punitive damages is to punish a wrongdoer so as to deter him from repeating his wrongful conduct in the future. Randol v. Kline's, Inc., 330 Mo. 343, 49 S.W.2d 112, 119 (1932) and McGill v. Walnut Realty Co., supra.

Having carefully reviewed all of the evidence in the light of the amount of actual and punitive damages awarded, this court is unable to say that the amounts awarded evince any indication of passion, prejudice or bias on the part of the jury.

Judgment affirmed.