MISSOURI PACIFIC RAILROAD COMPANY v. QUICK.

4-5797 137 S. W. 263

Opinion delivered February 26, 1940.

*Henry Donham* and *E. W. Moorhead,* for appellant.

*Robert J. Brown, Jr.,* and *L. B. Smead,* for appellee.

GRIFFIN SMITH, C. J. The appeal is from a judgment for $4,000 to compensate damages for false arrest.

The transaction was this: Appellee, who was a retailer of ice, had formerly sold junk. The morning of December 8, 1938, he was accosted by Special Agent Matt Bonds on unenclosed property in North Little Rock owned by Missouri Pacific Railroad Company, near the railroad shops.

Appellee says that about 12:30 o'clock a. m. he started up Pike avenue toward Levy, intending to stop at a place on Eighteenth and Pike streets and drink a bottle of beer. Finding the place closed, he proceeded to Thirteenth and Pike streets where the open area begins, the intention being to cut across to Eighteenth and Railroad streets to patronize a beer joint.

While walking down tracks that are used for burning coaches, appellee saw three men. Some overturned coaches were on the left of the track. Still proceeding up the center of the track, appellee says that when he saw the three men he stepped back to the left of the back coach, but did not actually stop until halted by Bonds. He says there was a path about where he passed the men, or where the men were.

Appellee's version of the transaction is that he had walked about two car lengths when some one commanded him to halt; whereupon, he started running. Two shots were fired. The ground was slippery, and

appellee fell. He had, however, decided that the man who commanded him to halt was probably a nightwatchman. As appellee endeavored to rise Bonds came near with a flashlight. After a heated discussion appellee was allowed to go home.

During business hours the morning of the 8th Bonds, accompanied by Jake Broadway (also a railroad agent) called at appellee's home. The latter agreed to go to Monroe's office in the depot "to explain the situation."

Appellee says Monroe accused him of stealing railroad property and insisted that he admit it. There is this testimony by appellee:

"I denied the charge and started to leave. When I got my hat they said, 'Sit down! You are not going anywhere.' They asked me to make a statement as to where I was the night before. I didn't want to make a statement, but they told me I had to; so I made one because I didn't see any other way of getting away from them. Then Mr. Monroe said, 'Take him to the North Little Rock jail and lock him up.' This statement was made to Bonds and Broadway and a clerk . . . Their manner was rough, and they convinced me I could not leave without being stopped. Bonds carried a gun. This was the only one I saw."

Appellee's explanation of subsequent treatment is that "They took me down to Mr. Broadway's car. Some of them got behind me and some in front of me and seemed to be crowding me close. We drove to the police station and they charged me with trespassing and made another charge[1]. They didn't docket me for that— I don't know why."

Appellee says he was locked up about eleven o'clock and was not permitted to communicate with his family. He remained in jail until the morning of December 10.

The record reflects that when appellee was brought to the police station December 8, Chief of Detectives McDougal noted on the docket that appellee was to be held on suspicion.

---

[1] The charge spoken of by appellee which was not preferred was that of resisting an officer.

At the hearing December 10 Bonds exhibited a quantity of sheet copper upon which the name "T. H. Quick" had been written with chalk. Appellee testified that Bonds charged him with having stolen the metal. The case was continued until December 17. The accused was then discharged. Between the two hearings he was released on his own recognizance.

Bonds testified that the railroad company had missed "quite a lot" of brass and copper from the yard where appellee was apprehended.

There are three tracks on that part of the property where appellee was stopped, all running east and west. Bonds stationed himself between two cars. On the th⁻ track—to the north—several coaches had been placed in order that they might be destroyed. While sitting in the position selected (to ascertain, if possible, who had been stealing the copper and brass) Bonds heard a peculiar noise. Almost simultaneously two men approached. They proved to be employees who had been working on a switch engine in the shops. The two men had just been relieved from their duties and were going home.

When the two late workers left, Bonds turned to his right. He was then near "the last of the three coaches," and about 150 yards from Pike avenue. "I was coming up the track," he said, "along the dark side of the coaches to where I heard the noise. When I got to within 25 steps behind the two coaches, Quick ran right in between the two coaches and me. I fired two shots after commanding him to halt, and he fell to the ground. I shot into the ground."

Appe'lee insisted he had not been guilty of conduct justifying arrest and refused to go with Bonds. Before taking his leave appellee went with the agent to the supposed place whence the noise came. Two piles of copper sheeting were found. The noise, according to Bonds, "sounded like somebody beating something together."

On the question of having detained appellee in Monroe's office, Bonds testified that a clerk named Weaver took appellee's statement; that appellee voluntarily signed it; that he went willingly with them to the police station where he was turned over to the desk sergeant; that appellee had on two previous occasions been found in the railroad yards and had been asked to stay out; that on one occasion appellee was in the yards "pilfering around"; that there are paths through the property used to some extent by the public, but there was not a path at the point appellee ran from on the morning of December 8.

Bonds insists that appellee was not under arrest.

It is freely admitted by appellee that he willingly went with the special agents to Monroe's office. But, it is insisted, he was there detained against his will, and was later taken by Bonds, Broadway, and another, to the North Little Rock police station.

At no time was violence used, nor does appellee claim to have been touched. He says that in leaving Monroe's office some of the agents were in front of him, and some were behind him, and "they seemed to be crowding me."

The conduct of the agents in Monroe's office was described by appellee in response to the leading question: "Tell the jury, Mr. Quick, just what was the manner of Mr. Monroe and the other officers in there in questioning you; that is, whether or not they talked to you in a friendly attitude. I don't want to suggest; but give the manner of their questioning of you." The reply was: "Their manner was rough, and they convinced me I could not leave without being stopped."

The record shows that at the time referred to by appellee he was being urged to make a statement. The entire transaction seems to have been one of words. The so-called coercion which convinced appellee he could not leave without being stopped was not that of force or threats. There was no suggestion of bodily harm—no "laying on of hands," no restraint other than that in-

duced by conversation which appellee characterized as "rough" without repeating the language used.

Upon reaching the police station the technical accusation was trespassing. But the police officer in charge, seemingly upon his own responsibility, made notation that the accused was being held on suspicion. Certainly there were suspicious circumstances attending appellee's arrest by Bonds when appellee was commanded to halt, and we think any reasonably prudent officer, or any agent having his employer's interests in mind, would have looked with misgivings upon appellee's conduct.

In the question asked by counsel for appellee, referred to *supra,* as a leading question, Monroe, Broadway, Bonds and Weaver are referred to as "officers." We must assume, therefore, that they were. Although appellant railroad company at one place in its brief discusses the events as though the agents were private individuals, there is the subsequent statement that "Under all of these circumstances the officers were justified in submitting the facts to the police."

In 35 A. L. R., at page 680, it is said:

"A railroad company is not liable for false arrest by a detective in its employ, of a passenger at its station, where the latter's appearance and behavior justified the belief that he had committed, or was about to commit, a felony."

In support of the foregoing rule, *St. Louis & San Francisco Railroad Company* v. *Wyatt,* 84 Ark. 193, 105 S. W. 72, is cited. A headnote to the Wyatt Case is: "A railroad company is not liable for the authorized act of one of its employees in causing the arrest of a passenger if such employee had reasonable cause for believing that such passenger had committed a felony."

We have not overlooked *Missouri Pacific Railroad Company* v. *Yancey,* 180 Ark. 684, 22 S. W. 2d 408. The facts in the Yancey Case are strikingly similar to those in the instant case. There is one material difference: In the Yancey Case White, the special agent, did not

testify that Yancey was in the act of committing a felony. On the contrary, he contended that the arrest was made at the instance of the city marshall of McGehee on a different charge.

The case at bar turns on the good faith of those charged with having falsely arrested appellee.

Our view is that there was probable cause for believing appellee was attempting to take property from the railroad yard.

The judgment is reversed and the cause dismissed.

Mr. Justice HUMPHREYS and Mr. Justice MEHAFFY dissent.