MABEL TEEL, Plaintiff-Appellant, v. MAY DEPARTMENT STORES COMPANY, a Corporation, and DEWEY C. ZYTOWSKI, Defendants-Respondents.

MABEL TEEL, Plaintiff-Respondent, v. MAY DEPARTMENT STORES COMPANY, a Corporation, and DEWEY C. ZYTOWSKI, Defendants-Appellants.—155 S. W. (2d) 74.

Division One, July 21, 1941.

Rehearing Denied, October 30, 1941.

*B. Sherman Landau* for plaintiff-respondent.

698

*Roscoe Anderson* and *Lewis, Rice, Tucker, Allen & Chubb* for defendants-appellants.

HYDE, C.—This is an action for $20,000 actual and $20,000 punitive damages for false arrest and imprisonment. The jury returned a verdict for $500 actual and $500 punitive damages, a total of $1000 for which judgment was entered. Plaintiff appealed and raises only the issue of inadequate damages. Defendant also appealed and assigns error in the refusal of a peremptory instruction and in Instruction No. 1 on which the case was submitted. Jurisdiction is here because plaintiff seeks a new trial (on issue of damages only) to recover the full amount claimed in her petition.

The facts hereinafter stated were shown by plaintiff's evidence (mainly testimony of plaintiff and A. F. Foster) considered most favorably to plaintiff's contentions. (We use the term defendant to refer to the corporate defendant.) Plaintiff's sister-in-law Leona Teel, who was separated from plaintiff's brother and had a divorce suit pending against him, lived with plaintiff in St. Louis during October and November of 1939. She went by the name of Leona Nesslein, the name of her former husband to whom she was married before she married plaintiff's brother. Leona had met Mr. A. F. Foster of Wood River, Illinois, that spring and he frequently came to see her. Plaintiff went out with them for the evening on one occasion. Foster gave Leona $125, which it may be inferred she used for her divorce. (She obtained a decree about December 4 or 5, 1939.) Foster also told Leona he would buy her a fur coat. She selected a coat at defendant's store, paid $3 on it, and had it "placed in the Will Call." Foster went with her on October 27th, got the coat, and had it ($116) charged to his account. Plaintiff rode down town with them on that trip. Foster was married and lived with his wife and thirteen-year-old son. However, Foster showed Leona a clipping from an Alton newspaper stating that a divorce suit had been filed by Fred Foster against Mary Foster (which was his wife's name) and Leona showed this to plaintiff. Foster testified that these were other parties and that he carried it "for quite a while and got many a laugh out of it." (Foster and his wife were never separated and were still living together at the time of the trial.) He did not say whether he told Leona that it did not refer to him, and it may be inferred that she and plaintiff thought it did, and believed that they would be married when both were divorced. Foster also gave Leona a letter addressed to "To Whom It May Concern," which stated that Leona Nesslein was authorized to buy on his account at the Famous-Barr Company, and stated a limit of $150 per month. Plaintiff said she saw this letter, but it was never presented to defendant and no notice of any such authorization was given to defendant.

(It was not produced at the trial.) Foster told Leona to tell them, at defendant's store, she was Miss Foster because "if she bought something and wanted to take it with her she could not give her name." (Unless she showed the letter.) He said he told Leona that the letter "was not to be used unless she was required to;" that "if anybody questioned it (her right to buy on his account) to produce this letter;" because, if she did not take her purchase with her, "it would have to come to the house, and she would have to come up here and get it." (It is not difficult to understand why that might prove an unworkable arrangement.) After the purchase of the coat, during the latter part of October and first part of November, Leona did buy, on Foster's account, such items as "shoes, women's gloves, women's hose, handkerchiefs, two bridge sets, luncheon cloth, pot holder and six towels," amounting to between thirty and forty dollars. Foster was employed by the Madison County, Illinois, Highway Department at $130 per month, and had no other income. His account with defendant was closed in December, 1939, when his father furnished the money to pay for the fur coat and other items.

On November 29, Leona asked plaintiff to accompany her to defendant's store. Leona purchased items there amounting to a total of $93.39. She told each of defendant's clerks from whom she purchased goods that she was Mrs. A. F. Foster. Plaintiff said that of course she knew Leona was not Mrs. Foster. Leona had left her car in a parking lot nearby and she and plaintiff carried some of the packages there and put them in her automobile, making at least two trips with packages to the car. The largest amount of the purchases were in the bedding department where she bought blankets and linens amounting to $53.26. When they went back to the bedding department to get these purchases defendant's detective Mr. Zytowski came over to plaintiff and asked her if she was charging on the Foster account and she motioned to Leona. Plaintiff testified as to what occurred thereafter as follows:

"He stepped over and asked her if she was charging on the Foster account, and she said that she was, and he said, 'Are you Mrs. Foster?' and she said, 'Yes;' and he said then to the girl at the wrapping desk, 'Well, you can hand each one a package,' and the girl did so, and then Mr. Zytowski said, 'Now, you will have to come along with me.' . . . I was afraid if we didn't go, we would be forced to go, so I didn't want a scene, so I went with him. . . . He took us up to the eighth floor, credit department. . . . Two lady detectives were seated directly behind us, and there were a couple of girls right in front of us at typewriters that looked at us. . . . Mr. Jackson (the credit manager, who had already called the Foster home, talked to Mrs. Foster, and had been advised by her that no one was authorized to buy on their account) asked Leona then if she was Mrs. Foster, and she said again that she was,

and he said, 'You know you are not telling the truth and might as well admit that you are not Mrs. Foster, because I know Mrs. Foster. . . . Then Leona had asked to use the telephone to call Mr. Foster. . . . They said no, that it would not do her any good to use the telephone. . . . She said if she could call Mr. Foster she could straighten things out with them. . . . Mr. Jackson said, 'Well, you are not telling the truth; you are not Mrs. Foster; you might as well admit the truth;' and Mr. Zytowski looked at me then and he said, 'You are just as guilty as this woman; you were carrying one of the packages, and you might as well tell the truth and save yourself a lot of trouble.' . . . I didn't say anything; and then Mr. Jackson became furious, and he said 'As far as I am concerned, you may turn those girls over to the proper authorities.' . . . Mr. Zytowski called me and was talking privately and he told me I better tell him who she was; he said I could make it mighty easy on myself; he said, 'You two girls are in terrible trouble; you are in an awful mess, and I don't know how you are going to get out of it.' . . . I told him I couldn't see where I was in any trouble at all, because Leona had written authorization to use the charge account, and I told him all about her supposed to be married to Mr. Foster, and I also told him that I had a charge account there, that I had it for years, and if I wanted anything I could use my own charge account; and I asked him if I could go, and he said no; and I asked him if I could use the phone and he said no; 'It would not do you a bit of good to use the phone;' and also told him who Leona was, I told him she was my sister-in-law, and that she was Miss Nesslein, and that she was married to my brother, and also before; she was Miss Abernathy, but went by the name of Miss Nesslein; and I told him all that and told him my address, and then he called her over. . . . I said to her, 'Well, Leona, I told Mr. Zytowski who you are and where you are from,' and then Mr. Zytowski asked her, he said, 'So, you are Miss Nesslein or Mrs. Teel?' and she said, 'Yes;' she admitted right up there in the credit department that she was Mrs. Teel or Miss Nesslein. . . . She explained to Mr. Zytowski that she was charging on Mr. Foster's account because she had permission to.''

They then were taken to Zytowski's office, and he ''told Leona where she made her great mistake was posing as Mrs. Foster. He said that was a very serious offense.'' Leona then showed him a love letter (but not the authorization letter) she had from Foster (offered in evidence at the trial) which made reference to his expectation that she would get some things from defendant's store, and stated ''that as soon as you were a free woman that things would be different;'' and that soon ''we can both be with each other and always enjoy each other's companionship.'' Zytowski, read it and said, ''Well, I am very sorry, but this doesn't mean a thing; it is only

signed 'Fred.' '' Leona also showed him a picture of Mr. Foster, but he said, "This picture doesn't mean anything; it could be anybody." Leona then told him that "about a month ago Mr. Foster bought me a fur coat here and put it on his charge account," and that the amount was $119. Zytowski said, "Well, Leona, I may have to have that fur coat back. Would you be willing to give that fur coat back? Would you be willing to give it up?" and she said, "Yes." (Later Zytowski did try to help Mrs. Foster, who went to see Leona, to get the coat so the Fosters would not have to pay for it but Leona never returned it.) Zytowski then made another call to Mrs. Foster at Wood River. While talking to Mrs. Foster, he said to Leona, " ',Mrs. Foster doesn't know you,' and then he said, ▮▮ 'Mr. Foster doesn't know you either;' and Leona was sort of surprised at that, because she did not know that Mr. and Mrs. Foster were living together,; she thought they were divorced. . . . She said, 'Can I talk to Mr. Foster?' Mrs. Foster was supposed to have said that Mr. Foster was sick in bed and he couldn't answer the phone.'; Mrs. Foster corroborated this at the trial, saying that she called Foster at the County Highway office and told him of the credit manager's call; that he said "don't let anyone have anything and don't call me because we are very busy here;" and that to keep him from being disturbed she told Zytowski he was sick and could not answer the phone. (Foster admitted that his wife called him about the credit manager's call.) After further conversation, in which plaintiff told Zytowski that she came from Belleville, Illinois, and talked about people there known to both of them, he said he hoped she was telling the truth and that "if you aren't it is going to be tough on you." Zytowski asked Leona: " 'Do you have any more packages or did you take any packages out of the store?' And she said, 'Yes;' and he said, 'How many?' and she said, 'Three;' and he said, 'Well, I will have to have that merchandise back.' And he asked two of the lady detectives to accompany me to the machine and get the packages." Plaintiff did go with them to the parking lot and helped them bring back the packages from the car. The store was closed when they returned. Plaintiff said they "were first taken into custody at 4:30 and we were released about 6:20 (P. M.)." Defendant's evidence did not help plaintiff but showed a shorter length of time; that they went to the credit department for the purpose of getting approval of credit charges; and that plaintiff voluntarily accompanied Leona and volunteered to get the packages from her car.

▮▮ It is not necessary for a plaintiff to prove malice or want of probable cause to make a case of false imprisonment. [Pandjiris v. Hartman, 196 Mo. 539, 94 S. W. 270; American Law Institute Restatement of Torts, sec. 44, and Missouri cases cited Missouri annotations, p. 23.] Nevertheless, it is well established, as the Restatement recognizes, that the owner of property has the right to take

action (by force or confinement reasonable under the circumstances) in defense of his property. [Restatement of Torts, secs. 77-80.] In such cases, probable cause may be an important element of the defense of justification. Therefore, it has been recognized that an owner of a store or other premises has the right to detain a person therein, for a reasonable time for a reasonable investigation, whom he has reasonable grounds to believe has not paid for what he has received or is attempting to take goods without payment. [22 Am. Jur. 368, sec. 24, also p. 408, sec. 78; 25 C. J. 471, secs. 36-39; annotation 26 A. L. R. 1333; Missouri Pacific Ry. Co. v. Quick (Ark.), 137 S. W. (2d) 263; Collyer v. S. H. Kress & Co. (Cal.), 54 Pac. (2d) 20; Chesapeake & Ohio Ry. Co. v. Welch (Ky.), 103 S. W. (2d) 698; Great Atlantic & Pacific Tea Co. v. Smith (Ky.), 136 S. W. (2d) 759; Standish v. Narragansett S. S. Co., 111 Mass. 512, 15 Am. Rep. 66; Jacques v. Childs Dining Hall Co. (Mass.), 138 N. E. 843, 26 A. L. R. 1329; Sweeney v. F. W. Woolworth Co. (Mass.), 142 N. E. 50, 31 A. L. R. 311; Fenn v. Kroger Grocery & Baking Co. (Mo.), 209 S. W. 885; Citizens Hotel Co. v. Foley (Tex. Civ. App.), 131 S. W. (2d) 402.] The distinction between cases, in which defense of one's property is involved and those in which arrest or imprisonment is made because of an offense against another, or for other purposes, is made clear in Collyer v. Kress & Company, supra. There plaintiff was found with unwrapped goods in his pockets, which defendant's detective had seen him take from the counter. He was detained and compelled to give back the goods. He was then turned over to the police and prosecuted, but was found not guilty by a jury at the trial. The court, in reversing a judgment in his favor for false imprisonment, held that there was not "an unreasonable compulsion and detention" under the circumstances; and that the evidence showed probable cause by which defendant was "justified in detaining plaintiff."

We note that the Springfield Court of Appeals, in Titus v. Montgomery Ward & Co., 232 Mo. App. 987, 123 S. W. (2d) 574, stated that Collyer v. Kress & Company, supra, "is in direct conflict with the rule adopted and uniformly followed by the courts of Missouri." This ruling in the Titus case was based on Pandjiris v. Hartman, supra, and cases following it. However, in the Pandjiris case, an instruction based on defense of justification (that plaintiff collected defendant's money and converted it to his own use) was held improper "for the reason that it presented an affirmative defense to the action which was not pleaded." [196 Mo. l. c. 548, 94 S. W. l. c. 272.] The court further said that "defendant under the general denial may introduce evidence which tends to show that he did not cause the arrest, but he cannot prove that he was justified in doing so, unless he has pleaded the facts in justification;" but that if "plaintiff made no such objection but allowed the evidence to go in, the

giving of the instruction submitting an issue to the jury which though not raised by the pleadings, yet was based on that evidence, was not reversible error.'' The case was reversed and remanded on other grounds to give the plaintiff a new trial. The principal controversy in the Pandjiris case was concerning the ownership of the property involved. · The right to restrain a person from taking the owner's property or to obtain its return was not directly considered, although the court did say that if he owned the store, ''defendant had the right to have him (plaintiff) ejected.''

We, therefore, approve the distinctions made, in Collyer v. Kress & Company, supra, as follows:

''Ordinarily, the owner of property, in the exercise of his inherent right to protect the same, is justified in restraining another who seeks to interfere with or injure it. [11 R. C. L. 805.] . . . The broad statement occasionally appears to the effect that probable cause is no defense in actions for false imprisonment. . . . In all cases involving solely the legality of the process, it is obvious that probable cause is not pertinent to any issue in the case. Because of like irrelevancy, the statement may properly· be made in cases of illegal arrests upon suspicion by a private person where, by statutory authority or otherwise, he is permitted to make such an arrest only when the offense is being committed in his presence. . . . However, those authoritites which hold, where a person has reasonable grounds to believe that another is stealing his property, as distinguished from those where the offense has been completed, that he is justified in detaining the suspect for a reasonable length of time for the purpose of investigation in a reasonable manner (citing cases), must necessarily proceed upon the ˙theory that probable cause is a defense. *And this is the law because the right to protect one's property from injury has· intervened.* In an effort to harmonize the individual right to liberty with a reasonable protection to the person or property of the defendant, it should be said in such a charge of false imprisonment, where a defendant had probable cause to believe that the plaintiff was about to injure defendant in his person or property, even though such injury would constitute but a misdemeanor, that probable cause is a defense, provided, of course, that the detention was reasonable. As already indicated, the rule should be different if the offense believed to be in·the process of commission relates to the person or property of another.'' (Our italics.)

In view of these distinctions, we will separately consider whether the evidence in this case, viewed most favorably to plaintiff, would show any unlawful conduct on the part of defendant, prior to the time of the return of the goods from the automobile in the parking lot to defendant's store, or any conduct so unreasonable that it would be actionable. There was involved here not only the protection of defendant's property but also the attempted commission of an offense

which would amount to more than a misdemeanor. (Which was not shown to be true in either Collyer v. Kress & Company or Titus v. Montgomery Ward & Company.) Leona was falsely claiming to be Mrs. Foster and obtaining defendant's goods under that false claim. Section 4488, R. S. 1939, makes this a crime, which under this section and Section 4456, R. S. 1939, would be a felony. The same would be true of an attempt under Section 4835, R. S. 1939. Plaintiff, in aiding and abetting in the commission of this offense, would under Section 4839, R. S. 1939, also be guilty of a felony. [See The State v. Cutter, 318 Mo. 687, 1 S. W. (2d) 96.] Plaintiff helped to carry some of the goods to the car, so knew where they were, when, at the credit department, Leona continued to insist that she was Mrs. Foster, and she (plaintiff) was refusing to answer when first asked there who Leona was. Finally, when Zytowski took her to one side, she did tell him the truth about her identity, and explained about her understanding of Leona's relation with Foster. Even then, in view of the fact that defendant had no notice from Foster of any such authority to buy on his credit, and had found the real Mrs. Foster at the Foster home, defendant's agents were undoubtedly justified in not accepting this explanation as the complete truth, and at least demanding the return of the goods. Prima facie, the conduct of Leona and plaintiff was sufficient to show that an offense under these statutes had been committed. ▪ Plaintiff says there was no crime because there was no criminal intent; but their conduct was sufficient to constitute such a crime, unless other circumstances justifying it could be shown from which lack of criminal intent would appear. Even though Foster may have deceived Leona as to his financial and family status (and plaintiff may have been misled thereby), nevertheless she was misrepresenting herself to defendant and making a false claim as to her identity, even after defendant's investigation had shown it to be false; and plaintiff was assisting her to conceal the truth by refusing to answer questions. Defendant's agents certainly made a reasonable investigation because Mr. Jackson called Mrs. Foster and learned that she was at home before any action was taken; and Mr. Zytowski, after talking to plaintiff and Leona, again talked to Mrs. Foster and attempted to talk to Mr. Foster. To be considered also is the fact of the large purchases made at this time and the earlier and still unpaid charges upon the account of a man whose only income was a salary of $130 per month. Under all these circumstances (which are very different from those in the Titus case), we cannot say that defendant should have inferred lack of criminal intent. On the contrary, our conclusion is that defendant's agents were within their rights in demanding and thus obtaining the return of the merchandise obtained from defendant by means of such false personation. We would not be willing to hold that the evidence shows

unreasonable or unlawful detention of plaintiff and Leona by defendant's agents up to the time of obtaining the return of the goods.

However, we do not think we can say that there could be no jury case of false imprisonment after the goods were returned. Defendant's agents, if they did not believe the explanation made by plaintiff and Leona (and there was evidence of reasonable grounds after investigation for not believing it), might have been within their rights if they had called the authorities to take them into custody and preferred charges against them under the statutes above cited. Instead of doing this (accepting plaintiff's evidence as true) Zytowski undertook to do something that not even the public authorities had any right to do, namely: to compel them to sign confessions under threat of not permitting them to leave his office until they did so. Plaintiff said that after she got back with the merchandise from the car, Zytowski was writing a confession for Leona, and that it was "about twenty-five minutes" after she got back, "before he got it finished," then "he gave it to Leona and wanted her to sign it," but "she said she didn't want to sign it." Plaintiff further testified: "He told us before we would have to sign those statements, or we would not be permitted to leave. . . . He called me over and started writing some sort of a confession for me, . . . it took him quite a little time to write it out, and he handed it to me, and I signed it right away, thinking I would be permitted to leave. . . . He told me I was very smart in signing mine, and he said, 'Now, go over and tell her what kind of a fool she is.' And I went over and told her I thought she was foolish; that we would be permitted to leave; and she said, 'Mabel, I don't want to sign it; it doesn't seem right.' And I said, 'Well, sign it anyway, so we will be permitted to leave,' and she signed it very reluctantly. . . . After she signed that confession and gave him the paper he said, 'Now, I don't give a damn what you do.'" The confession signed by plaintiff stated: "When we were approached by Mr. Zytowski he asked who is Mrs. Foster and I pointed to Mrs. Leona Teel, even though I knew that was not true." This was Zytowski's version in his testimony at the trial. Plaintiff's testimony was that "he approached me and asked me if I was charging on the Foster account, and I just motioned with my thumb to Leona." She specifically denied that she ever said that Leona was Mrs. Foster and stated Zytowski only asked "Who is charging on the Foster account?" This was a material change so far as making a case against plaintiff was concerned. Leona's statement fully admitted the false personation of Mrs. Foster.

It is well settled that unreasonable delay in releasing a person, who is entitled to be released, or such delay in calling, taking him before or turning him over to proper authorities, or in wrongfully denying opportunity to give bond would thereafter amount to false

imprisonment. [Harbison v. C., R. I. & P. Ry. Co., 327 Mo. 440, 37 S. W. (2d) 609, 79 A. L. R. 1; annotation, 79 A. L. R. 13; 25 C. J. 491-495, secs. 61-65; 22 Am. Jur. 366, sec. 20; 1 American Law Institute Restatement of Torts, p. 315, sec. 136.] Although defendant was within its rights in doing what it did to obtain the return of the goods, nevertheless, as said in Restatement, p. 317, Zytowski was "not privileged to use the power, which ▆▆▆ his custody of another (here held for the purpose of obtaining return of its goods) gives him over the other, to force the other to comply with any demand which has no relation to accomplishing the purpose for which the custody is privileged." Certainly, neither the privilege to restrain plaintiff for the purpose of obtaining return of the goods or in order to turn her over to the proper authorities charged with a felony under the above cited statutes would give defendant any authority to hold plaintiff to compel her to give a confession in violation of her civil rights under the Constitution of this State. [Art. 2, Secs. 22-24.] Of course, defendant had evidence to show that this statement and the stay in Zytowski's office for its preparation was wholly voluntary but that issue was for the jury. [See Missouri Pacific Ry. Co. v. Quick, supra.] While it would not be improper to request a written statement (see Collyer v. Kress & Company, supra), defendant had no right to compel it by coercion. We also approve of the rule adopted by the Restatement that defendant's "misconduct (if found) makes it liable to (plaintiff) only for such harm as is caused thereby and does not make (it) liable for the arrest or for the keeping (of plaintiff) in custody prior to the misconduct." We must, however, hold that the court correctly denied defendant's request for a peremptory instruction.

▆▆▆ The court recognized that defendant's conduct was not wholly wrongful, and refused the instructions of plaintiff submitting the case on such theory as well as refusing defendant's theory that defendant had the right to do everything that was shown. The court, of its own motion, gave an instruction which stated that "if you further find and believe from the evidence that such imprisonment, if you find there was such imprisonment, was to a greater extent than was reasonably necessary to enable defendants to recover or retake from plaintiff and her companion Leona Teel the merchandise . . . then such imprisonment, if any, constitutes false imprisoment and plaintiff is entitled to recover." This was erroneous because it authorized the jury to make imprisonment shown prior to the return of the merchandise (or some part thereof) a basis for recovery, instead of only what occurred thereafter.

The judgment is reversed and the cause remanded. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.