**Arthur J. MAURELLO, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**No. CIV. A. 99–357 MLC.**

United States District Court,
D. New Jersey.

June 30, 2000.

Arthur J. Maurello, Hillsborough, NJ, pro se.

John Andrew Ruymann, Office of the United States Attorney, Trenton, NJ, for defendant.

COOPER, District Judge.

This matter comes before the Court on a motion for partial summary judgment by plaintiff Arthur J. Maurello ("Maurello") against defendant United States of America (the "United States"), and a cross-motion for summary judgment by the United States against Maurello, both pursuant to Federal Rule of Civil Procedure 56. Maurello seeks to establish the United States' liability under the Federal Tort Claims Act, 28 U.S.C. § 2674 (the "FTCA"), alleging that the United States Bureau of Prisons (the "Bureau") negligently or intentionally failed to admit him into an earlier residential drug treatment program while he was incarcerated at Federal Prison Camp Allenwood ("Allenwood") in Pennsylvania, thereby subjecting him to an additional fifty-one days of imprisonment. The United States seeks to avoid liability on Maurello's ·claim alleging that the Bureau had no duty to place Maurello in an earlier class and that the Court lacks subject matter jurisdiction over this action because, pursuant to the discretionary function exception to the FTCA found at 28 U.S.C. § 2680(a), the United States has not waived sovereign immunity to this action. For the reasons expressed in this Memorandum Opinion, we hold that this Court lacks jurisdiction over Maurello's claims because they are essentially a claim for false imprisonment and the FTCA's waiver of sovereign immunity does not apply to a claim arising out of false imprisonment in these circumstances. Accordingly, Maurello's motion is denied and the United States' motion is granted.

## BACKGROUND

On March 27, 1995, Maurello began serving a 36–month sentence at Allenwood, which is run by the Bureau, following his conviction for fraud offenses.[1] (Aff. of Arthur J. Maurello filed 3–9–00 ("Maurello Aff.") ¶ 2.) On May 26, 1995, Maurello applied for admission into Allenwood's residential substance abuse treatment program, which is offered to inmates with a treatable condition of substance abuse or addiction pursuant to the Violent Crime Control and Law Enforcement Act of 1994, codified in relevant part at 18 U.S.C. § 3621(b) and (e) (the "Treatment Provision"). (See id. ¶ 3.)

The Treatment Provision requires the Bureau to "make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse." 18 U.S.C. § 3621(b). The time within which the Bureau was required to comply with the Treatment Provision was to be phased in over three years:

> [S]ubject to the availability of appropriations, [the Bureau] shall provide substance abuse treatment (and make arrangements for appropriate aftercare)—
>
> (A) for not less than 50 percent of eligible prisoners [2] by the end of fiscal year 1995,[3] *with priority for such treatment accorded based on an eligible prisoner's proximity to release date;*
>
> (B) for not less than 75 percent of eligible prisoners by the end of fiscal year 1996, *with priority for such treatment accorded based on an eligi-*

---

1. Because the Court is granting the United States' motion for summary judgment and denying Maurello's motion for partial summary judgment, the Court will view the evidence in a light most favorable to Maurello. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

2. The term "eligible prisoner" means a prisoner who is determined by the Bureau to have a substance abuse problem and who is willing to participate in a residential substance abuse treatment program. 18 U.S.C. § 3621(e)(5)(B).

3. In fiscal year 1995, the Bureau provided residential substance abuse treatment to 10,625, or 66%, of the 16,000 eligible inmates. Aff. of Arthur J. Maurello filed 4–3–00 ("2Maurello Aff.") Ex. E: Substance Abuse Treatment Programs in the Federal Bureau of Prisons Report to Congress ("Report to Congress") at 12.

ble prisoner's proximity to release date; and

(C) for all eligible prisoners by the end of fiscal year 1997 and thereafter, *with priority for such treatment accorded based on an eligible prisoner's proximity to release date.*

18 U.S.C. § 3621(e)(1) (emphasis added). As indicated by the above underscored language of the Treatment Provision, priority for treatment is to be based on an eligible prisoner's proximity to release. *Id.* The Treatment Provision also provides an incentive for eligible inmates who have not been convicted of a violent offense to participate in the program:

The Period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve.

18 U.S.C. § 3621(e)(2)(B). The Bureau's policy when Maurello was participating in the program was to grant all inmates who had successfully completed the program and who were eligible for early release the full one year custody reduction unless the inmate had less than 18 months remaining on his sentence upon completion of the program, in which case the inmate would be released after completing his required placement for 180 days at a halfway house. (*See* Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. filed 4–3–00 ¶ 14 n. 12 and Ex. C: Resp't's Br. filed 4–22–96 at 11, *Hines v. Crabtree*, 935 F.Supp. 1104 (D.Or.1996) (No. 96–498–HA) (brief filed by the United States citing Program Statement Number 5162.02 dated 7–24–95)); *see also Hines*, 935 F.Supp. at 1110 (recognizing Bureau's policy of granting one-year reduction to all eligible inmates who completed program).

Allenwood's program lasts almost nine months and in accordance with Bureau policy each class is supposed to be limited to 24 inmates. (*See id.* ¶ 4; Report to Congress at 7; Decl. of Richard Findlay filed 3–13–00 ("Findlay Decl."), Ex. 1:

Program Statement 5330.10 dated 5–25–95 ("Program Statement") § 5.2.1.)

During the Spring and Summer of 1995, Allenwood staff maintained and frequently updated a waiting list of eligible inmates. (2Maurello Aff. ¶ 6.) Among other things, the waiting list included each eligible inmate's projected release date, and such inmates were placed into each next available class based upon the inmates' proximity to release. (*Id.*) The waiting list was maintained by the programs director, Richard Findlay, Ph.D. ("Dr. Findlay"), and eligible inmates were permitted to inquire of Dr. Findlay from time to time regarding their status on the list. (*Id.* ¶ 7.) In connection with Maurello's application for admission into the program, Maurello was asked to submit documentation from outside sources to verify his alleged history of alcohol abuse because Maurello's central file and his pre-sentence report did not indicate that he had a documented substance abuse problem. (Decl. of Richard Findlay filed 3–13–00 ("Findlay Decl.") ¶¶ 12–13 and Ex. 3.) On or about June 20, 1995, Dr. Findlay received a handwritten letter from Dr. Steven I. Wolinsky dated June 15, 1995 stating that Maurello "had an alcohol dependency for several years up to 3/24/94." (*Id.* ¶ 13 and Ex. 4.) Soon thereafter, Dr. Findlay confirmed the authenticity of Dr. Wolinsky's letter. (*Id.* ¶ 14.)

Maurello alleges that during the week of June 18, 1995, Dr. Findlay told him that he was eligible for the program. (Maurello Aff. ¶ 7; 2Maurello Aff. ¶ 5.) On July 3, 1995, Tim Fahy, a drug treatment specialist at Allenwood, completed a Residential Treatment Eligibility Interview of Maurello and determined that he met the criteria for a diagnosis of alcohol dependence. (Findlay Decl. ¶ 16 and Ex. 5.) On July 7, 1995, Maurello was given a Progress Report dated June 29, 1995 by Allenwood staffperson J. Cramer. (Maurello Aff. ¶ 7; 2Maurello Aff. ¶ 5.) The report, which was signed by the Case Manager and Unit Manager for the B Unit, indicated that

"Maurello has not yet participated in any formal counseling programs. However, he has applied for and been accepted into the ADAPT Program with a tentative start date of July 18, 1995. This program is designed to help him deal with an alcohol abuse problem." (Maurello Aff. Ex. B: Progress Report dated 6–29–95 at 2, ¶ D.)

The next program class, Class 12, was scheduled to begin, and did begin, on July 18, 1995. (Maurello Aff. ¶ 12.) In mid-July, a few days prior to the actual start of class 12, Maurello asked Dr. Findlay to confirm whether or not he would be participating in Class 12. (*Id.* ¶ 15.) Dr. Findlay told Maurello that Maurello would not be in Class 12, but would probably be in Class 13. (*Id.*) Maurello asked Dr. Findlay if there were inmates in Class 12 with projected release dates later than Maurello's. (2Maurello Aff. ¶ 11.) Dr. Findlay told Maurello that there were inmates admitted to Class 12 with later release dates than Maurello but that those inmates had already been moved into C–Unit (the building housing treatment participants) and that a decision had been made not to move them out again. (*Id.*) At least four inmates who participated in Class 12 had projected release dates that were later than Maurello's release date. (*Id.* ¶ 12.)

The United States claims that Maurello was not admitted into Class 12 because he was not found eligible for the program until after admission for Class 12 had been finalized. (Findlay Decl. ¶¶ 16–18 and Ex. 5.) The United States argues that Dr. Findlay exercised his judgment in determining when residential treatment program classes were finalized. (*Id.* ¶ 19.) The United States asserts that inmates accepted into a class have to be physically moved to the unit where the inmates will be housed during the program. (*Id.*) The United States claims that based upon the number of inmates to be moved (24), the requirements of the residential treatment program, and the obvious security, organizational, and logistical concerns inherent in a prison environment, Dr. Findlay had to establish a deadline for admission into any residential treatment program class. (*Id.*) The United States maintains that Dr. Findlay exercised his discretion in determining to finalize the list of inmates to participate in a particular class one to two weeks before the class was to begin.[4] (*Id.*)

The United States argues that Maurello was not found to have met the eligibility requirements for the program until Dr. Findlay had reviewed and approved Mr. Fahy's recommendation on July 14, 1995. (*Id.* ¶ 16 and Ex. 5.) The United States also asserts that before any inmate could be admitted into the program, Dr. Findlay required an admissions panel to discuss the eligible applicants and to approve their admission into the program.[5] (*Id.* ¶ 17.)

**4.** Maurello disputes the United States' assertion that a predetermined schedule needed to be followed necessitating the finalization of a residential treatment program class one to two weeks before its start. (*See* 2Maurello Aff. ¶ 27.) Maurello claims that even if Bureau policy required a class to be finalized one to two weeks before a class' start date, such a policy was not followed while he was participating in the program. (*Id.*) Maurello asserts that one of the participants in Class 13 was moved into the C–Unit, which housed the participants only two or three days prior to the start of that class. (*Id.*) Maurello also alleges that one of the participants in Class 14, a transferee into Allenwood from another institution, was moved into C–Unit for treatment a full week after the rest of the class had begun the program. (*Id.*)

**5.** Maurello questions whether there was an "admissions panel" in place when admission into Class 12 and Class 13 was decided. (*See* 2Maurello Aff. ¶¶ 24–26.) Maurello alleges that the "admissions panel" is not referred to in any statute, regulation, program statement, or operations memorandum that was effective during early 1995. (*Id.*) Maurello also claims that the Bureau never referred to an "admissions panel" to him during his incarceration or in response to his administrative complaint. (*Id.*) In addition, the United States never referred to an "admissions panel" during these proceedings until it filed its response to Maurello's motion for partial summary judgment. (*Id.*) Moreover, Dr. Findlay's affidavit, upon which the United States relies for asserting the existence of an "admissions panel," uses vague language when describing the "admissions panel" and its activities.

The United States alleges that during the time period relevant to Mr. Maurello's application, the admissions panel was comprised of Dr. Findlay, who headed the panel, Mr. Fahy, and the C Unit manager, Dennis Falk. (*Id.*) The United States claims that, typically, some or all members of the admissions panel would meet each month, usually one to two weeks before a particular class was to begin, to discuss and review applications of inmates and then finalize the list of inmates for that class. (*Id.*) The United States alleges that Maurello had not yet been approved for admission into the program when the panel had finalized the list of inmates for Class 12. (*Id.*)

Maurello was ultimately admitted into Class 13, which began on September 25, 1995. (*Id.*) Maurello met or exceeded all program requirements and expectations of the program staff, received higher-than-average ratings, was chosen by staff as Class 13 spokesman, and was chosen by the members of Class 13 to speak at graduation. (*Id.* ¶ 13.) During Maurello's treatment in the program, the Bureau changed Maurello's projected release date from October 31, 1997 via good time credit to December 17, 1996 via his participation in the program. (*Id.* ¶ 14, n. 12, Exs. C, D.) Maurello successfully completed the program on June 11, 1996. (*Id.* ¶ 13) Had Maurello been enrolled in and completed Class 12, instead of Class 13, Maurello would have graduated from the program on April 18, 1996, he would have been moved to a halfway house during the last week of April, 1996, and his projected release date would have been set for, and he would have been released on, October 31, 1996. (*id.* ¶ 15)

On or about May 28, 1997, Maurello filed an administrative tort claim with the Bureau seeking $1,051,000 in damages for being incarcerated for 51 days longer than

he would have had he been admitted into Class 12. (Decl. of N. Torres filed 3–13–00 Ex. 3.) On or about September 26, 1997, the Bureau denied Maurello's claim. (*Id.* Ex. 4.) On or about March 9, 1998, Maurello requested reconsideration of the Bureau's denial of his claim. (*Id.* Ex. 5.) On or about August 13, 1998, the Bureau denied Maurello's request for reconsideration. (*Id.*)

Maurello filed a Complaint in this Court on January 26, 1999 asserting three counts. (Compl.) Count one seeks compensatory damages under the FTCA for the Bureau's negligent failure to place Maurello in Class 12 of the residential treatment program as allegedly required pursuant to the Treatment Provision. (*Id.*) Counts two and three seek compensatory and punitive damages for the Bureau's willful and wanton, or in the alternative intentional and knowing, disregard of the law in failing to place Maurello in Class 12 of the residential treatment program as allegedly required pursuant to the Treatment Provision. (*Id.*) Maurello seeks partial summary judgment establishing the United States' liability on all three counts under the FTCA. The United States' motion for summary judgment seeks dismissal of all three counts of Maurello's Complaint, alleging that the Bureau had no duty under Pennsylvania law to place Maurello in an earlier class and that the Court lacks subject matter jurisdiction over this action because, pursuant to the discretionary function exception to the FTCA found at 28 U.S.C. § 2680(a), the United States has not waived sovereign immunity over this action.

## DISCUSSION

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

(Findlay Aff. ¶ 17.) The United States provides no documentary evidence to establish when the "admissions panel" met to discuss Class 12 and Dr. Findlay's affidavit merely

states that "[i]t would have been typical that one or two weeks before Class 12 was to begin, the admissions panel finalized the list of inmates for that class."

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party opposing the motion "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The adverse party must do more than assert some metaphysical doubt as to the material facts; "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec.,* 475 U.S. at 586–87, 106 S.Ct. 1348 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the non-moving party. However, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 248–50, 106 S.Ct. 2505. Thus, summary judgment is appropriate not only if an opposing party fails entirely to support its position with evidence, but also if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

## I. *Whether the United States is Liable Under the FTCA*

Under the FTCA, the United States can be held liable for money damages:

for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b); *see also* 28 U.S.C. § 2674 (outlining circumstances under which liability may be imposed pursuant to the FTCA). The waiver of the United States' sovereign immunity pursuant to the FTCA is limited in several respects. For example, the FTCA's waiver does not apply to:

Any claim *arising out* of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights ...,[6]

28 U.S.C. § 2680(h) (emphasis added),

[a]ny claim based upon an act or omission of an employee of the Government,

---

**6.** This exception also provides that "with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of [the FTCA] shall apply to any claim arising ... out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecu-

tion. For purposes of this subsection, 'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."

exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused,

28 U.S.C. § 2680(a), or any claim "for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674.

The Court will first address whether the United States has waived sovereign immunity with regard to Maurello's claims under the FTCA, thereby granting this Court subject matter jurisdiction over this action.

### A. Whether the Court Has Subject Matter Jurisdiction

Maurello phrases his complaint as claims for intentional or negligent failure to comply with a federal statute, which failure proximately caused him to be incarcerated 51 days longer than he would have been had the Bureau complied with the statute. (Compl.) Although phrased in these terms, the substance of Maurello's claims appears be that he was falsely imprisoned. "It is, of course, the substance of the claim, and not the language used in stating it, that controls." *Blitz v. Boog,* 328 F.2d 596, 598 (2d Cir.1964). If the substance of Maurello's claims falls within the rubric of "false imprisonment," then the Court lacks subject matter jurisdiction over Maurello's claims.[7] 28 U.S.C. § 2680(h).

 In determining whether Maurello's claim falls within the false imprisonment exception to the FTCA, we must determine what Congress meant by "false imprisonment" when it enacted the FTCA in 1946. *See United States v. Neustadt,* 366 U.S. 696, 707, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961). Thus, the Court should look to the "established" definition of "false imprisonment" in 1946, rather than the law of any particular state. *See id.; see also Cross Bros. Meat Packers, Inc. v. United States,* 705 F.2d 682, 683 (3d Cir.1983) (holding that the scope of the § 2680(h) exceptions are defined by federal, not state, law). In *Neustadt,* the United States Supreme Court referred to the American Law Institute's Restatement of Torts, among other sources, to determine whether a claim fell within § 2680(h)'s "misrepresentation" exception to the FTCA. *Neustadt,* 366 U.S. at 706 n. 16, 81 S.Ct. 1294. The Restatement of Torts defines false imprisonment as follows:

(1) An act which, directly or indirectly, is a legal cause of a confinement of another within boundaries fixed by the actor for any time, no matter how short in duration, makes the actor liable to the other irrespective of whether harm is caused to any legally protected interest of the other, if

(a) the act is intended so to confine the other or third person, and

(b) the other is conscious of the confinement, and

(c) the confinement is not consented to by the other, and

(d) the act is not otherwise privileged.

(2) An act which is not done with the intention stated in Subsection (1,a) does not make the actor liable to the other for a merely transitory or otherwise harmless confinement, although the act involves an unreasonable risk of imposing

---

**7.** As a preliminary matter, Maurello does not allege that the negligent or wrongful acts or omissions upon which his claims are based were committed by "investigative" or "law enforcement" officers. *See* 28 U.S.C. § 2680(h). In addition, the evidence submitted by Maurello does not appear to support such a finding. Because Maurello has failed to make allegations to support a claim under the exception to 28 U.S.C. § 2860(h), *see* note 6, *supra,* we hold that this exception does not apply. *See Barber v. Grow,* 929 F.Supp. 820 (E.D.Pa.1996) (holding that exception to § 2680 did not apply in inmate's claim for assault under the FTCA because inmate failed to provide evidence that guard was investigative or law enforcement officer).

it and therefore would be negligent or reckless if the risk threatened bodily harm.

Restatement of the Law of Torts ("Restatement"), vol. 1, § 35 (1934). "To make [an] actor liable under the rule stated in § 35, it is only necessary that he intend to confine the other ... or that he know that such confinement will, to a substantial certainty, result. The actor's motives in so confining the other are immaterial." Restatement, § 44, Comment a.

Other sources make clear that a person will be liable for false imprisonment if he intentionally refuses to release another from confinement when the person is legally obligated to do so. 25 Corpus Juris, False Imprisonment § 66 (1921) (citing authority); 22 Am.Jur. § 21 (1939) (citing authority); *see Teel v. May Dep't Stores Co.*, 348 Mo. 696, 155 S.W.2d 74, 137 ALR 495, 503 (1941) (holding that it is well settled that unreasonable delay in releasing a person who is entitled to be released would thereafter amount to false imprisonment) (citing additional authority); *see also* Prosser & Keeton on Torts § 11 (5th ed.1984) (citing cases going back to 1614); Restatement of the Law, Second, Torts.2d ("Second Restatement"), vol. 1, § 45 (1965) (same); *Cf.* Restatement, §§ 134, 136 (discussing liability for excessive confinement following a proper arrest). Illustration 1 to the Second Restatement, which is based upon a 1914 case from the Arkansas Supreme Court,[8] states:

A is confined in jail under a sentence for a term. At the end of the term B, the jailor, is under a legal duty to release A, but refuses to do so. B is subject to liability to A.

Second Restatement § 45, Illustration 1. The above sources make clear that the "established" definition of "false imprisonment" when the FTCA was enacted certainly encompassed a situation where a prison refused to release a prisoner despite having a legal duty to do so.

■ Maurello's cause of action "arises out" of the Bureau's refusal to release him on the date he claims he would have been released had he been admitted into Class 12 as he claims the Bureau was legally obligated to do. (*See* Compl., First Count ¶¶ 20–23.) This finding is supported by the fact that Maurello does not claim to have been harmed by the delay in receiving treatment but only by the additional detention allegedly resulting from the Bureau's failure to admit him into Class 12. (Compl., First Count ¶ 23.) In fact, his complaint requests $1,000 in compensatory damages for each day he claims he was unjustly imprisoned. (Compl., First Count, Wherefore Clause.) Thus, the substance of Maurello's claim appears to be one for false imprisonment.[9] Accordingly, the Court lacks jurisdiction over Maurello's action.

## II. *Whether Maurello's Claims Have Merit*

The Court notes that even if it had subject matter jurisdiction over Maurello's action, the Court would be compelled to

---

**8.** Illustration 1 is taken from *Weigel v. McCloskey*, 113 Ark. 1, 166 S.W. 944 (1914).

**9.** To allege a cause of action for false imprisonment, it matters not whether the defendant acted with malice or bad faith; a person will be liable for false imprisonment even if he negligently believes that his confining of plaintiff is justified. *See, e.g.,* 25 Corpus Juris, False Imprisonment § 66 n. 23[a] (citing *Martin v. Collins*, 165 Mass. 256, 43 N.E. 91 (1896) for proposition that jailer is not liable for false imprisonment for detaining a prisoner beyond his term in absence of bad faith or negligence); *Teel*, 348 Mo. 696, 155 S.W.2d

74, 137 ALR at 503–04 (holding that it is well settled that unreasonable delay in releasing a person who is entitled to be released would thereafter amount to false imprisonment); *see also* Restatement §§ 134, 136; Restatement of the Law, Second, Torts.2d, Appendix, vol. 1, § 136, Reporters Notes and Court Citations to First Restatement (1966). Thus, whether the delay in releasing Maurello from custody was the result of the Bureau's alleged bad faith or its unreasonable belief that it was justified in detaining Maurello beyond the time Maurello claims he should have been is irrelevant.

grant summary judgment in favor of the United States on Maurello's intentional tort and negligence claims.

## A. *Maurello's Intentional Tort Claims*

■ Maurello has failed to allege a valid cause of action based on an intentional tort. Maurello argues in his brief,

> However one chooses to categorize the tort complained of herein, arising out of the intentional refusal of defendant's employees, acting in the scope of their employment, to follow clear statutory requirements in administering a government program intended to benefit the plaintiff, such refusal redounding to his detriment, said behavior certainly doesn't constitute ... any of the ... enumerated exceptions found in [28 U.S.C.] § 2680(h).

(Pl.'s Br. in Supp. of Summ. J. at 31.) Maurello cites numerous cases that allegedly support his argument. (*Id.* at 30.) None of the cases cited, however, recognized the government's liability under the FTCA for the intentional tort of intentional violation of a federal statute depriving someone of the benefit of a government program. The cases cited by Maurello only recognize the intentional torts of intentional infliction of emotional distress, invasion of privacy, and trespass. (See cases cited in Pl.'s Br. in Supp. at 30.) Maurello's claim does not constitute any of these torts. Furthermore, this Court would decline Maurello's invitation to find that Pennsylvania would recognize the intentional tort he asserts.[10] Accordingly, even if the Court had subject matter jurisdiction over Maurello's action, Maurello's intentional tort claims would fail.[11]

## B. *Maurello's Negligence Claim*

■ Maurello has also failed to allege a valid cause of action based on negligence. Maurello argues in his brief that the Bureau's alleged violation of the Treatment Provision is "negligence per se." (Pl.'s Br. in Supp. Summ. J. at 22.) Although Pennsylvania recognizes the concept of "negligence per se" based upon the violation of a federal law, not all violations of federal law will provide the basis for a finding of liability under Pennsylvania law. *See Cecile Indus., Inc. v. United States,* 793 F.2d 97, 99 (3d Cir.1986). The failure to follow a federal statute or regulation may be "negligence per se" "if, under state law criteria, it may be considered the kind of ... [statute or] regulation violation of which is negligence per se." *Id.* (quoting *Schindler v. United States,* 661 F.2d 552, 560–61 (6th Cir.1981) (ellipses in original)). Pennsylvania courts have relied upon Section 286 of the Restatement of Torts, Second in determining whether to impose liability pursuant to the doctrine of "negligence per se" and accepted it as an accurate statement of the law. *See Frederick L. v. Thomas,* 578 F.2d 513, 517 (3d Cir.1978); *Congini v. Portersville Valve Co.,* 504 Pa. 157, 470 A.2d 515, 517 (1983). Section 286 of the Restatement of Torts Second provides:

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and

---

**10.** The FTCA imposes liability on the United States to the same extent as a private person "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Pennsylvania law must be applied because Maurello alleges that all of the acts or omissions occurred in Pennsylvania. (*See* Maurello Aff. ¶ 2; Pl.'s Br. in Supp. of Summ. J. at 20 n. 24.)

**11.** Maurello seeks punitive damages in connection with his intentional tort claims. (Compl., Counts 2 & 3.) Even if the Court had subject matter jurisdiction over Maurello's intentional tort claims and those claims had merit, the Court would lack subject matter jurisdiction over his request for punitive damages. *See* 28 U.S.C. § 2674.

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

Restatement of the Law, Second, Torts.2d, vol. 2 § 286 (1965). Applying section 286, the Court holds that application of the "negligence per se" doctrine is not appropriate in this case because we find that the Treatment Provision was designed to assist prisoners with their substance abuse problem and to benefit society as a whole by the expected reduction in substance-abuse-related crimes committed by prisoners following their release from prison, not to provide early release to prisoners. *See* Anti–Crime Legislation: Hearings on H.R. 3131 Before the Subcomm. on Crime and Criminal Justice of the House of Representatives Comm. on the Judiciary, 1993 WL 664306 (Oct. 21, 1993) (statement of Paul Kamenar, Executive Legal Director of the Wash. Legal Foundation). We find that the early release provision is merely an incentive provided to prisoners to get them to participate in substance abuse treatment. *See id.* Thus, the requirements of subsections (b), (c), and (d) of the Second Restatement on Torts § 286 have not been met. Accordingly, we do not believe a Pennsylvania court would apply the doctrine of "negligence per se" in finding a private party liable for violating the Treatment Provision under the circumstances of this case. *See* 28 U.S.C. § 1346(b).

### CONCLUSION

For the reasons expressed above, the Court finds that it lacks jurisdiction over Maurello's action. The Court holds therefore that the United States is entitled to summary judgment dismissing all counts of the Complaint.